## In re SECRETARY OF TREASURY.

### (Circuit Court, N. D. California. September 16, 1895.)

CUSTOMS DUTIES—WITHDRAWALS FROM BOND—IMPORTATIONS UNDER PRIOR LAWS.

Goods which were imported under the tariff law of 1883, placed in a bonded warehouse, and remained therein more than three years prior to the enactment of the McKinley law (Act Oct. 1, 1890), could not be withdrawn for consumption upon payment of duties and charges at the rates prescribed in the McKinley law; nor, after the passage of the Wilson act (Aug. 28, 1894), could they be withdrawn at the rates prescribed thereby; for Rev. St. §§ 2970–2973, which limit the time for leaving goods in bond to three years, and provide that thereafter the government may cause the same to be sold to enforce payment of the duties, were not repealed, either expressly or by implication, by the McKinley law or the Wilson law, and the right of the government to enforce payment of the duties and charges prescribed by the act of 1883 was, under such circumstances, "a right accrued" so as to be within the saving clause of section 54 of the McKinley law, and the liability of the goods was "a liability under a prior law," within the saving clause of the Wilson law. In re Schmid, 54 Fed. 145, distinguished. U. S. v. Abbott, 20 Ct. Cl. 281, disapproved.

In the matter of the petition of the secretary of the treasury for a review of a decision of the board of United States general appraisers in relation to the withdrawal for consumption of certain steel rails.

F. S. Foote, U. S. Atty., and Samuel Knight, Asst. U. S. Atty., for petitioner.

Charles A. Garter and J. F. Evans, for respondents.

McKENNA, Circuit Judge. The facts of the case are stipulated by the parties, and are recited in the opinion of the board of appraisers, as follows:

"The Bank of California, at various times between March 2 and June 24, 1887, imported into the port of San Francisco certain T steel rails, aggregating 5,678 tons. These rails remained in general order unclaimed until February 27, 1888, when warehouse entries thereof were made, and bonds given by the Bank of California as the importer and consignee. Said warehouse entries were liquidated under the act of March 3, 1883, at $17 per ton, and at the expiration of one year from the date of importation the additional duty of 10 per cent. prescribed by section 2970, Rev. St., was charged up on the bonds against the merchandise. Between September 21, 1888, and December 6, 1889, four withdrawals for consumption were made, and the amount of duties charged thereon was paid. When the bonded period of three years was about to expire, the Oregon Pacific Railroad Company, for whose account the steel rails in question had been imported, represented to the treasury department that serious casualties had occurred to its road by storms and floods, and requested a postponement of the sale of merchandise required under section 2971, Rev. St., whereupon the secretary of the treasury authorized a postponement of the sale for three months, without giving due notice to or having the consent of the principal or sureties on the warehouse bonds. Similar postponements have been allowed for periods of six months up to the present date, the Bank of California uniting in two instances in the application for delay. A postponement of the sale of merchandise allowed by the secretary of the treasury September 16, 1893, was conditioned upon the consent of the sureties on the bond. The final postponement was authorized by the secretary of the treasury March 25, 1895, pending decision regarding the legal status of the goods by the board of

general appraisers. Under date of June 30, 1890,—more than three years after the date of importation,—the secretary of the treasury authorized the collector at San Francisco to permit withdrawals for consumption of the steel rails in question from time to time, in such quantities as might be desired. On October 21, 1890, the treasury department decided that withdrawals might be made, under the act of 1890, by the importers, at the rates of duty, regular and additional, prescribed by the act of 1883. Notwithstanding this decision, 3,306 tons of the steel rails were withdrawn for consumption, and in addition to 10 per cent., as prescribed by section 2970, Rev. St., duties were paid thereon and accepted by the collector at $13.44 per ton, the rate prescribed therefor in the act of October 1, 1890. All charges and expenses, including storage charges, having been paid, the importers recently offered to withdraw for consumption the remainder of the merchandise in bonded warehouse at the rate prescribed in paragraph 117 of the act of August 1, 1894. Permission to make such withdrawal has not been granted by the secretary of the treasury, but in lieu thereof authority was given the collector to permit withdrawal entry to be made by the importers of a small portion of the merchandise at the rates prescribed in the act of March 3, 1883, in order that a test case for judicial decision might be made. In accordance with the authority thus granted, entry for consumption of twenty of the rails in question (weighing about 5 tons) was made by the importers, and duty was assessed thereon by the collector at $17 per ton, and 10 per cent. additional under the act of March 3, 1883,— the act in force at the time the merchandise was imported. Against this action the importers protested, claiming that the merchandise in question, having been withdrawn for consumption after August, 1894, was properly dutiable at seven-twentieths of 1 cent per pound, in accordance with the provisions of section 1 and paragraph 117 of the present act."

The tariff act of 1883 was in force at the time of the importation of the rails, and continued in force until the enactment of the act of 1890, known as the "McKinley Bill." Under the latter act the duty was made $13 per ton, and under the act of August, 1894, known as the "Wilson Act," it was made $7.84. As is well known, imported merchandise could be entered for immediate consumption or it could be entered for warehousing; and in the latter case there were certain provisions of law applicable to it. Section 2970, Rev. St., provided for the periods for which, and the terms upon which, merchandise could remain in bond without paying duty. It could remain for one or three years, and during such times it could be withdrawn for consumption. If in one year, "on payment of the duties and charges to which it may be subject by law at that time"; if after one year, and before the expiration of three years, "on payment of the duties assessed on the *original entry, and charges,* and an additional duty of ten per centum of the amount of such duties, and charges." (The italics are mine.) After three years the permission to withdraw goods for consumption expired, and section 2971 provided that:

"Any goods remaining in public store or bonded warehouse beyond 3 years shall be regarded as abandoned to the government and sold under such regulations as the secretary of the treasury may prescribe, and the proceeds paid into the treasury."

But section 2972 provided that the secretary, in case of sale, may pay to the owner, etc., the proceeds thereof, after deducting duties, charges, and expenses. In 1890 congress enacted a law to simplify the collection of revenues, called the "Administrative Act," section 20 of which provided for the withdrawal for consumption of bonded

goods, which was amended by section 54 of the McKinley act. The section as amended is as follows, omitting a proviso, with which we are not concerned:

"That any merchandise deposited in bond in any public or private bonded warehouse may be withdrawn for consumption within 3 years from the date of original importation on payment of the duties and charges to which it may be subject by law at the time of such withdrawal."

The difference between this section and section 2970, Rev. St., is that it makes but one period,—three years,—and provides that the goods withdrawn any time within it shall be subject to the duty then provided by law. This act contained no provision for goods not withdrawn within three years, nor did the administrative act have such provision. If left provided for at all, it was by sections 2971 and 2972, Rev. St., supra. The administrative act explicitly repealed a number of sections of the Revised Statutes, but not those sections, and added:

"And all other acts and parts of acts inconsistent with the provisions of this act are hereby repealed. But the repeal of existing laws or modifications thereof embraced in this act shall not affect any act done or any right accruing or accrued,   *   *   *   but all liabilities under said law shall continue and may be enforced in the same manner as if said repeal or modifications had not been made.   *   *   *"

Section 50 of the McKinley act, which is the only other one necessary to quote in full, is as follows:

"Sec. 50. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued, shall be subjected to no other duty upon the entry or the withdrawal thereof than if the same were imported respectively after that day: provided, that any imported merchandise deposited in bond in any public or private bonded warehouse having been so deposited prior to the first day of October, eighteen hundred and ninety, may be withdrawn for consumption at any time prior to February first, eighteen hundred and ninety-one, upon the payment of duties at the rates in force prior to the passage of this act: provided further, that when duties are based upon the weight of merchandise deposited in any public or private bonded warehouse said duties shall be levied and collected upon the weight of such merchandise at the time of its withdrawal."

The act also repealed all prior inconsistent laws, but saved all rights which had accrued, by the same words as the administrative act, supra. The Wilson act contained no administrative provisions with which this case is concerned. A claim, however, is based on its first section, which will be referred to hereafter.

From this statement of the facts and the statutes, the question is, to what duty was the merchandise subject? The secretary of the treasury decided that of the act of 1883, or $17 per ton, and on grounds which apply to the whole importation. The board of appraisers decided that of 1894, or $7.84 per ton, but on grounds which confine the decision to 20 rails, or 5 tons, only. This is to be regretted, as it leaves us without the views of the board (necessarily valuable) of the relations of the acts of congress. The board based its decision on the act of the secretary in authorizing the with-

drawal of the merchandise for consumption; but the stipulation of the parties is that this was to enable the right to be tested, not to make the right. Besides, if the importers can claim this against intention, the difficulties of the matter are not solved, or even evaded. The question, then, occurs, what right has the secretary to permit a withdrawal for consumption, under the circumstances; or, if he have this right as an alternative of a sale, at what duty? And the question can only be answered by determining the changes which the McKinley and Wilson acts make in pre-existing laws. Necessarily, therefore, a decision as to the five tons involved in this case is a test of the whole importation, and I have given the contentions of parties a proportionate attention.

The merchandise, as we have seen, was imported in 1887, and was entered for warehousing February 27, 1888, and the duties liquidated under the act of 1883, and a bond given by the importers to secure their payment. Under the law, the rights and liabilities of the importers were very plain. They could have withdrawn the merchandise for consumption in one year upon paying the duties, to wit, $17 per ton; that being the duty they were subject to, the law of 1883 being then in force. Or after said year, and within three years from June, 1887 (the date of the last importation), they could have withdrawn the merchandise upon paying such duty and 10 per cent. additional duty. Some of the merchandise was withdrawn before the expiration of three years, and the duties paid; but the greater part of it, including the rails in controversy, was not withdrawn, and on the 24th day of June, 1890, became subject to sections 2971–2973, Rev. St.; in other words, became to be regarded as abandoned to the government, and to be subject to sale by the secretary of the treasury to satisfy the then duty, to wit, $17 and 10 per cent. additional and charges. This was the status at that date—the right of the government—the liability of the merchandise indisputably, and were only not exacted or enforced because the Oregon Pacific Railway Company, for whose account the merchandise was imported, requested a postponement of the sale for three months, representing that serious casualties had occurred to its road. Other postponements by like request, the sureties on the warehouse bond consenting, for periods of six months, were given. Pending these periods, the tariff acts with the provisions, supra, were passed.

The question raised by these facts is direct: Did the right which undoubtedly accrued on the 24th of June, 1890, continue after the passage of the McKinley and Wilson acts? Or, using their saving language, was it not, regarding the government, "a right accruing or accrued"? Was it not, regarding the merchandise, "a liability under a prior law," continued under said acts? It seems necessarily that the answer must be in the affirmative. The government had a right, in the juridical sense of that word; that is, an enforceable claim. It came into existence in June, 1890, and existed for nearly two months before the passage of the administrative act, and might have been enforced during such time but for the solicitation

of the parties interested in the merchandise, or, at any rate, could have been enforced. It was a right "accruing or accrued," therefore, in the legal and popular sense of those words, and presumably in the sense in which they were intended by such act and the McKinley act. Prior to the decision of the supreme court in U. S. v. Burr, 15 Sup. Ct. 1002, it could have been plausibly contended that the rights saved by the act were not those of the United States, or not claims to duties; and the former was so held by the circuit court. 66 Fed. 742. The supreme court, however, took a different view, and held that the act preserved the rights of the government as well as the rights of the importers, and included claims to duties.

The conflict settled in that case was between the McKinley and Wilson acts, and the merchandise in controversy arrived August 7, 1894. Duties were paid August 8th, and the merchandise delivered August 11th; but it was not until August 28th that the fact was stamped on the entry that the goods were liquidated as entered. The Wilson act went into effect August 28th, but its first section provided "that on and after the 1st day of August, 1894, * * * there shall be levied and collected * * * the rates of duty which are by the schedules and paragraphs respectively prescribed. * * * *" And it was contended from the plain language the court was imperatively required to conclude that it was the intention of congress that the act should have a retrospective operation as of August 1st, although it did not become a law until after that date. The court refused to make this literal application of the words of the statute, and said, through Chief Justice Fuller:

"And upon the threshold we are met with the fact that the act of October 1, 1890, was not repealed in terms until August 28, 1894; and that the repealing section of the latter act kept in force every right and liability of the government or of any person which had been incurred or accrued prior to the passage thereof, and thereby every such right or liability was excepted out of the effect sought to be given to the first section. The right of the government to duties under the tariff law which existed between August 1st and August 28th was a right accruing prior to the passage of the act of 1894 (that is, the date when the bill became a law); and the obligation of the importers between August 1st and August 28th to pay the duties on their entries under the existing tariff law was a liability under that law, arising prior to the passage of the act of 1894; and, if congress intended that section 1 should relate back to August 1st, still the intention is quite as apparent that the act of October, 1890, should remain in full force and effect until the passage of the new act on August 28th, and that all acts done, rights accrued, and liabilities incurred under the earlier act, prior to the repeal, should be saved from the effect thereof as to all parties interested, the United States included."

This construction satisfies the natural meaning of the language of the acts, and gives effect, and consistent effect, to every provision. But without the provision of the acts saving rights and continuing liabilities accruing or accrued under prior laws, it is disputable if the contention of the importers could be sustained under the ruling in Fabbri v. Murphy, 95 U. S. 191. In that case it appeared that sugar was imported in November, 1869, which was entered for warehousing. It was classified under the law then in force as "No. 12 Dutch Standard," and the duty of three cents per pound assessed against it.

While it was in the warehouse, and before the expiration of a year, the act of July 14, 1870, was passed, providing for a lower rate of duty, and making it applicable to goods in bonded warehouse upon the entry thereof for consumption. Under this act the sugars were reclassified by appraisers as "No. 7 Dutch Standard," and a rate of entry noted at 1¾ cents per pound. On the 20th of January, 1871, the importers made a withdrawal entry of the sugars for consumption, and the collector charged them with the lesser duty of the act of 1870, but exacted as a penalty 10 per cent. additional of the duties which had been assessed on the original entry. At the time of the original entry the act of March 14, 1866, was in force. This was the original of section 2970, Rev. St., and provided that goods could be withdrawn for consumption within one year from the date of original importation on payment of the duties and charges to which they may then be subject by law. After a year, and before the expiration of three years, they could be so withdrawn on payment of the duties assessed on the original entry and charges and an additional 10 per cent. of the amount of such duties and charges. Payment of the original duty was made without objection, but protest was made against payment of the 10 per cent., and suit was instituted to recover the amount. Judgment went against the importers, and it was affirmed by the supreme court. There was no express repeal of the old act, but its consistency or inconsistency with the new one was directly presented for decision. The supreme court held that there was no inconsistency. Mr. Justice Clifford, speaking for the court, repeating the rule of Wood v. U. S., 16 Pet. 342, said that, to work a repeal of an old law, there must be a positive repugnancy between it and the new one; and further said that such repeal is not favored in any case, and must always meet with disfavor where the attempt is made to apply the principle in the construction of revenue laws of the United States. "Acts of congress," the learned judge also said, "are often very complex in their provisions, in order to enable those charged with their execution to protect the treasury against the constant attempts of importers to evade the payment of new duties or increased taxation. New regulations often become necessary to enable officers of the customs to defeat such designs; and the rule is that in such cases there ought to be a manifest and irreconcilable repugnancy to warrant the conclusion that the old law is abrogated, or that the new law was intended to supersede the antecedent provision. Aldridge v. Williams, 3 How. 9; Distilled Spirits, 11 Wall. 356." Counsel for claimants cites, to sustain his contention, In re Schmid, 54 Fed. 145, and Abbot v. U. S., 20 Ct. Cl. 281. The facts in Re Schmid were not the same as the facts of the case at bar. In that case the merchandise was imported and entered January 10 and March 9, 1889, and remained in warehouse until January, 1891. In other words, the time during which it could be withdrawn for consumption had not expired; hence it was in one of the classes of section 50 of the McKinley act,—that is, was under bond for warehousing (to quote the language of the section), and subject to withdrawal for consumption,—upon which act and time the duties were to be levied

as of October 1, 1890. This distinguishes the case from the case at bar. In the case at bar the time within which the steel rails could have been withdrawn had expired fully under the law to which they were subject when imported, and before the enactment of the administrative or McKinley acts, and therefore the government's claim was a "right accrued" and saved by the provisions of those statutes that their repealing clauses or modifications should not affect "any right accruing or accrued." It is certainly the duty of interpretation to give effect to these provisions, as well as to section 50; and both can only be given effect by respectively applying them to the different conditions recognized or created by the law,—the former, where rights have accrued against the merchandise; the latter, where it is still subject to the demand of the importers. The difference in the conditions may be less substantial under the late acts than under the prior ones, but they are still maintained. The administrative act (section 20), and the McKinley act (section 54), which amended it, provide for a bonded period of three years, and neither repeal section 2971, Rev. St., which provides for abandonment of the merchandise, and the right of the secretary of the treasury to sell it. In Abbot v. U. S., the fact as to the time the merchandise was in the warehouse is the same as the case at bar; that is, it remained there more than three years after its importation. The question came up on a refund of duties, they having been paid within the three years. This, however, makes no difference in principle, and the case sustains the contention of the importers. It, however, seems not to have been very well considered. It involves the construction of section 10 of the tariff act of 1883 and sections 2970 and 2971 of the Revised Statutes. Section 10 of the act of 1883 was a repetition of the act of 1870, and section 2970 of the Revised Statutes was a substantial repetition of the act of March 14, 1866. In Fabbri v. Murphy, supra, both acts were passed on, and held consistent, and hence both enforced, and the additional duties prescribed by the latter held legal. If the provisions of these acts were consistent in 1870, they were consistent in 1885. Fabbri v. Murphy does not appear to have been drawn to the attention of the court of claims. The decision, no doubt, responded only to the points presented, and in the manner presented, and hence took only a partial view of the statutes. The court seemed to be controlled by what it deemed the all-embracing language of section 10 of the act of 1883, and conceived that, because the proceeds of the sale on merchandise derelict under section 2971 were not absolutely forfeited, the government could not have had rights in it at all,—a view which ignored, even if it could be otherwise sustained, section 13 of the act of 1883, which provided: •

"That the repeal of existing laws or modifications thereof, embraced in this section shall not affect any act done or right accrued * * * before the said repeal or modifications; but all rights and liabilities under said laws shall continue and may be enforced in the same manner as if said repeal or modifications had not been made. * * *"

I cannot, therefore, regard this case as authority.

The claimants contend that the Wilson act is even more comprehensive and conclusive than the McKinley act, and determines

the rate of duty to be collected on the rails in controversy at $7.84 a ton. The first section, which is relied on, is as follows:

"Be it enacted," etc. "That on and after the first day of August, 1894, unless otherwise specially provided for in this act, there shall be levied and collected and paid upon all articles imported from foreign countries or withdrawn for consumption and mentioned in the schedules herein contained, the rates of duty which are by the schedules and paragraphs respectively prescribed, namely: * * * 117. Railway bars made of iron or steel and railway bars made in part of steel T rails and punched iron or flat rails, seven-twentieths of one cent per pound."

Section 72 repealed prior inconsistent laws, but preserved rights and liabilities which had accrued or arisen thereunder substantially in the same language quoted from the administrative and McKinley acts, supra. The efficiency of the section to the contention is in the words "withdrawn for consumption." But what they mean has already been sufficiently explained. As we have seen, all the acts provide a period during which goods could remain in bond. They all fix it at three years, and it is only within this period that goods may be "withdrawn for consumption"; and hence it is to this period, and to what may be done within it, that the language of the section must be regarded as addressed. By so regarding it, no policy of the new act is disappointed, as urged by counsel for claimants. Its policy undoubtedly was to reduce rates, but it was consistent—indeed, suitable—to have considered some things as done, some rights as having accrued, and to leave them undisturbed. Besides, we know that the authors and advocates of the measure in the house of representatives did not deem that its policy depended upon the use of the words "withdrawn for consumption" in the situation in which we find them in the act. They were inserted in the senate. Does the debate there show their purpose? Counsel say that it shows agreement between senators "presenting," to quote counsel, "all shades of opinion on tariff policy on the following propositions: (1) That there should be the same rate for goods in bond as for those to arrive; (2) that goods withdrawn from bond should pay the same rate of duty as others; and (3) that the words of the amendment would certainly insure these objects." Senator Hale, however, who participated in the debate, and who ought to have been in the center of its certainty and light, charged, without distinguishing by shades of tariff opinion, the most veteran senators with diversity on every proposition concerning the amendment, and said:

"While there is not anything partisan in the four simple words 'or withdrawn for consumption,' yet there were as many theories advanced as to what the amendment meant, and whether it ought to be in the bill or out, and as to whether it is found in some other section of some other law, as there were senators who rose in their seats to discuss the matter."

And, addressing the advocates of the measure specially, he said:

"But let us at least be relieved from uncertainty about what ought to be the plainest provision; and I appeal to the senator from Missouri [Mr. Vest], and through him to the senator from Arkansas [Mr. Jones], and through both of them to the senator from Tennessee [Mr. Hawes], and through all three of them to the senator from Texas [Mr. Mills], to let this matter go out for the present, and get together about the table in the room of the com-

miitee on finance, call in experts from both sides, and give us some language that is authoritative, and the meaning of which we know."

But, assuming that agreement on the propositions stated by counsel may be discerned in the debate, it may also be discerned what was meant by being "in bond," and "withdrawn for consumption," and that the amendment was only the repetition of existing law. These give us some guide to the meaning, and show that its general language was addressed to, and intended to provide for, a well-known condition, and was not intended to assimilate all conditions. See remarks of Senators Aldrich, Jones, Vest, Allison, and Sherman, Cong. Rec., May 10, 1894, p. 5430 et seq.

A question identical with the one at bar arose under the act of 1883, and was decided by Attorney General Brewster in accordance with the views herein expressed. 17 Op. Atty. Gen. 650. See, also, opinion of Attorney General Olney of January 17, 1895, substantially to the same effect.

I think, therefore, that the rails in controversy became subject to duty under the act of 1883, and to such duty the government had acquired a right before the passage of the McKinley and Wilson acts, which were preserved and continued by them. The decision of the board of general appraisers is therefore reversed.