VANDEGRIFT & Co. *v.* UNITED STATES (No. 1904).[1]

1. CONSTRUCTION, SECTION 500, REVENUE ACT OF SEPTEMBER 8, 1916.—"WHEN IMPORTED."

The expression "when imported," in section 500, revenue act of September 8, 1916 (39 Stats., 756), should be read as meaning "which are imported" and should be construed as having no purpose to change the time or condition under which a collection of revenue is to be had.

2. CONSTRUCTION, PARAGRAPH Q OF SECTION 4, TARIFF ACT OF 1913, AND REVENUE ACT OF SEPTEMBER 8, 1916.

There being no conflict between paragraph Q of section 4, tariff act of 1913, and the revenue act of September 8, 1916, the paragraph was not repealed by the revenue act. Nor should they be regarded as separate and independent of each other. The principle of paragraph Q, that goods in bond shall be subjected to the rate of duty in force at the time of withdrawal and not to that in force at the time of entry, should be applied in the administration of the revenue act. Consequently, dyes which were imported and bonded before but withdrawn after the revenue act went into effect are dutiable under the revenue act of 1916 and not under the tariff act of 1913.

## United States Court of Customs Appeals, April 1, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8131 (T. D. 37510).

[Affirmed.]

*Comstock & Washburn* and *J. Stuart Tompkins* for appellants.
*Bert Hanson*, Assistant Attorney General (*Irving Washburn*, special attorney, of counsel), for the United States.

[Oral argument Nov. 7, 1918, by Mr. Tompkins and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

This appeal presents the single question whether certain dyestuffs are properly dutiable under the tariff act of October 3, 1913, or the revenue act of September 8, 1916. The merchandise arrived at the port of New York on September 5, 1916, whereat on September 7, 1916, an immediate transportation entry was made therefor and forwarded in bond to the port of Philadelphia. It further appears that a consumption entry paper was filed therefor at Philadelphia on September 8, 1916, but the duties were not paid nor permit of delivery issued until September 16, 1916. Liquidation was made October 26, 1916, under the act of September 8, 1916. Due protest was made against such liquidation, and upon appeal to the Board of General Appraisers the action of the collector in this particular was affirmed. The case is here upon appeal from that decision of the board.

The pertinent parts of the tariff act of 1913 are as follows:

AN ACT TO REDUCE TARIFF DUTIES AND TO PROVIDE REVENUE FOR THE GOVERNMENT, AND FOR OTHER PURPOSES.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That on and after the day following the passage of this act, except as otherwise specially provided for in this act, there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands and the islands of

Guam and Tutuila) the rates of duty which are by the schedules and paragraphs of the dutiable list of this section prescribed, namely:

DUTIABLE LIST.

SCHEDULE A—CHEMICALS, OILS, AND PAINTS.

\*     \*     \*     \*     \*     \*     \*

20. Coal-tar dyes or colors, not specially provided for in this section, 30 per centum ad valorem.

\*     \*     \*     \*     \*     \*     \*

FREE LIST.

\*     \*     \*     \*     \*     \*     \*

SECTION II.

[Income tax provisions.]

\*     \*     \*     \*     \*     \*     \*

SECTION III.

[This section provides for the character and form of invoices and declarations; penalties for frauds upon the customs by false entries and otherwise; the form of entries; penalties and additional duties for undervaluations; appraisement of merchandise and the legal requirements of a valid appraisement; duties of the appraisers and boards of general appraisers; the right to file protest in reappraisement, re-reappraisement, and classification cases; finality of the decision of the appraising officers; and among other things as follows:]

\*     \*     \*     \*     \*     \*     \*

S. Any merchandise deposited in any public or private bonded warehouse may be withdrawn for consumption within three years from the date of original importation on payment of the duties and charges to which it may be subject by law at the time of such withdrawal: *Provided*, That nothing herein shall affect or impair existing provisions of law in regard to the disposal of perishable or explosive articles.

[Also for allowances upon nonimportations; for the refund of duties; and other matters of administration.]

\*     \*     \*     \*     \*     \*     \*

SECTION IV.

[This section consists of miscellaneous provisions, including bounty provisions; provisions relating to discriminating duties; provisions relating to bonded manufacturing warehouses and smelting warehouses; excise taxes; drawback; and particularly paragraph Q.]

\*     \*     \*     \*     \*     \*     \*

Q. That on and after the day when this act shall go into effect all goods, wares, and merchandise previously imported, for which no entry has been made, and all goods, wares, and merchandise previously entered without payment of duty and under bond for warehousing, transportation, or any other purpose, for which no permit of delivery to the importer or his agent has been issued shall be subjected to the duties imposed by this act and to no other duty upon the entry or the withdrawal thereof:
\*   \*   \*.

The act of September 8, 1916, United States Statutes at Large, 64th Congress, 1915–1917, vol. 39, part 1, Public Laws, chapter 463, in pertinent parts reads:

AN ACT TO INCREASE THE REVENUE, AND FOR OTHER PURPOSES.

\*     \*     \*     \*     \*     \*     \*

TITLE V.—DYESTUFFS.

SEC. 500. That on and after the day following the passage of this Act, except as otherwise specially provided for in this title, there shall be levied, collected, and

paid upon the articles named in this section when imported from any foreign country into the United States or into any of its possessions, except the Philippine Islands and the islands of Guam and Tutuila, the rates of duties which are prescribed in this title, namely:

FREE LIST.

Group I.   *   *   *

DUTIABLE LIST.

Group II.   *   *   *

Group III.   *   *   *

SEC. 501. That on and after the day following the passage of this Act, in addition to the duties provided in section five hundred, there shall be levied, collected, and paid upon all articles contained in Group II a special duty of 2½ cents per pound, and upon all articles contained in Group III   *   *   *.

SEC. 502. That paragraphs twenty, twenty-one, twenty-two, and twenty-three and the words "salicylic acid" in paragraph one of Schedule A of section one of an Act entitled "An Act to reduce tariff duties and to provide revenue for the Government and for other purposes," approved October third, nineteen hundred and thirteen, and paragraphs three hundred and ninety-four, four hundred and fifty-two, and five hundred and fourteen, and the words "carbolic" and "phthalic," in paragraph three hundred and eighty-seven of the "free list" of section one of said Act, and so much of said Act or any existing law or parts of law as may be inconsistent with this title are hereby repealed.

It is contended by the importers, who are the appellants in this case, that the act of September 8, 1916, is an independent act which must be read by itself uninfluenced by, without advertance to, or any consideration of paragraph Q of section IV of the said tariff act of 1913.

It is contended by the Government that the two acts must be read together as a single act in pari materia, that paragraph Q is not repealed by nor inconsistent with any of the provisions of the act of September 8, 1916, and, therefore, should be construed as if it were a part of the latter act.

It will be noted by the phraseology of section 502 of the act of September 8, 1916, that it expressly repeals certain parts only of the tariff act of 1913. It is, therefore, intended to be amendatory of that act, substituting in lieu of repealed provisions of the act of 1913 the provisions of the act of 1916. The repealing clause of the act of 1916 (section 502) is expressly limited to certain designated portions of the act of 1913 and "so much of said act or any existing law or parts of law as may be inconsistent with this title are hereby repealed."

The rule of law is too well settled to need discussion, that where one act repeals another in part only the two acts must be read together. This is particularly true as to revenue acts. Every provision of each act which can be given some force and effect consistent with the provisions of the other must be so construed. And where the repealing act expressly designates that portion of the one act which it is intended to repeal or modify the remaining provisions of the repealed act are impliedly affirmed. That revenue laws, as modified from time to time, are always construed together has

uniformly been held by the courts.  Wilson *v*. Maxwell (2 Blatch., 316); Thomson *v*. Maxwell (2 Blatch., 385).

The question was early adjudicated by the Supreme Court of the United States.  The tariff act of July 14, 1832, furnished a method of appraisement of imported merchandise.  The basis of appraisement established by that act was foreign market value. The act of March 2, 1833, repealed only such parts of previous acts as were inconsistent with itself, establishing as a basis of appraisals home market value, but established no methods of appraisal.  Chief Justice Taney in Aldridge et al. *v*. Williams (3 How., 44 U. S., 8), said (at p. 24):

Taking this view of its general character and objects, the very large sum ultimately involved in the controversy makes it the duty of the court to proceed to a closer and more careful examination of its different provisions.  It is evidently supplementary to the act of July 14, 1832, and repeals only so much of that act, and of other previous acts, as are inconsistent with it.  All of the duties, therefore, imposed by the act of 1832, *or any other law, and all the rules and regulations provided for their collection, remain in full force*, unless they are inconsistent with the act in question.  (Italics ours.)

The question was again before the Supreme Court in Ring et al. *v*. Maxwell (17 How., 58 U. S., 146).  The tariff act of 1842 provided that if the appraised value of merchandise should exceed by 10 per cent or more the invoice value an additional duty of 50 per cent should be imposed.  The tariff act of 1846 reduced this additional duty to 20 per cent.  There was nothing, however, in the latter act prescribing the methods of determining this duty or for its collection. The Supreme Court of this legislation states:

The tariff act of 1846 is an act fixing new rates of duty on imports.  It does not contain any provisions for the collection of those duties, nor for the collection or distribution of any penalties.  It does not, in terms, adopt the existing laws on those subjects, nor declare that they shall be deemed applicable to the duties and penalties which it levies; yet it is obvious that it must have been intended that those existing laws should be thus applied; and this can only be effected by considering the duties and penalties levied by the act of 1846, as substitutes for, and to be governed by the same rules as, the corresponding duties and penalties levied by the act of 1842, which did, in terms, adopt and apply the existing laws for the recovery, collection, and distribution of duties and penalties.

We accede, therefore, to the positions that the additional duty levied by the act of 1846 is only a substitute for that levied under the act of 1842, and that whatever rule was in force when the act of 1846 was passed, concerning the distribution of the additional duty levied by the 17th section of the act of 1842, is also in force, and is to be applied to the additional duty under the 8th section of the act of 1846, which is here in question.

The same principle of decision was adopted by the Supreme Court in United States *v*. Walker, etc. (63 U. S., 299).  Speaking of amendatory revenue laws in pari materia that court said (at p. 311):

Suppose there was nothing in the language of the act to qualify the provision, and nothing in the history of the legislation upon the subject to aid in the exposition; still

we would not think it so clearly inconsistent with the prior law as to operate as a repeal. Repeal by implication, upon the ground that the subsequent provision upon the same subject is repugnant to the prior law, is not favored in any case; but where such repeal would operate to reopen accounts at the Treasury Department long since settled and closed, the supposed repugnancy ought to be clear and controlling before it can be held to have that effect. Such was the doctrine substantially laid down by this court in Wood *v.* United States (16 Pet., 303); and we have no hesitation in reaffirming it as applicable to the present case. Aldridge et al. *v.* Williams (3 How., 23); United States *v.* Packages of Dry Goods (17 How., p. 93); 2 Dwarris on Stat., 533.

All of these additional compensation acts are in pari materia with the several acts prescribing the sources of emolument, *and the whole must be construed together.*

So, in Fabbri *v.* Murphy (5 Otto, 95 U. S., 191, at p. 196), the rule that the provisions of all revenue acts in pari materia must be read together was clearly and succinctly set forth in the following language:

Authorities to show that there must be a positive repugnancy between the provisions of the new law and the old, to work a repeal of the old law by implication, and that even then the old law is only repealed to the extent of the repugnancy, are very numerous and decisive. Wood *v.* United States (16 Pet., 342).

Repeal by implication, upon the ground that the subsequent provision upon the same subject is repugnant to the prior law, is not favored in any case, and must always meet with disfavor where the attempt is made to apply the principle in the construction of the revenue laws of the United States.

Acts of Congress of the kind are often very complex in their provisions, in order to enable those charged with their execution to protect the Treasury against the constant attempts of importers to evade the payment of new duties or increased taxation. New regulations often become necessary to enable the officers of the customs to defeat such designs; and the rule is, that in such cases there ought to be a manifest and irreconcilable repugnancy to warrant the conclusion that the old law is abrogated, or that the new law was intended to supersede the antecedent provision. Aldridge *v.* Williams (3 How., 9); The Distilled Spirits (11 Wall., 356).

In re Secretary of Treasury (71 Fed., 505, 510); Anglo-California Bank *v.* Secretary of Treasury (76 Fed., 742, 753).

So that it would appear beyond controversy that the tariff act of 1913 and the revenue act of 1916 should be read together as a single act, and the provisions of each be given full force and effect save where they are expressly repealed by the latter act or are absolutely inconsistent and irreconcilable in terms.

It is claimed, however, upon behalf of the importers that the provisions of paragraph Q can not be read consistently with the provisions of the act of 1916 for the reason that the context of paragraph Q is literally confined in its application to the tariff act of 1913. It is true that that provision contains the words "shall be subjected to the duties imposed *by this act*," and other similar language which refers the operation of the paragraph literally to the provisions and rates of duty of the tariff act of 1913. Nevertheless, as a concrete rule of official performance it can as well be read a part of the act of 1916 as the act of 1913. Practically, there is nothing in paragraph Q inconsistent with any of the terms of the act of 1916. That

act simply prescribes a rate of duty to be levied upon merchandise. There is nothing in its language contravening the language of paragraph Q nor in the least inconsistent therewith. Indeed, counsel for the importers in their briefs and at the oral argument admitted that had Congress inserted paragraph Q as a provision of the act of 1916 their contention would be without merit. Obviously its provisions under such circumstances would in no wise conflict with the other provisions of the act of 1916, and the other provisions of that act could clearly and consistently be enforcible in the mode prescribed by paragraph Q, were it a member paragraph of the act of 1916, and that is the test which has been laid down by the Supreme Court in almost precisely the same legal conspectus. Thus in Ring et al. *v.* Maxwell (17 How., 58 U. S., 146), the precise question was decided. Section 26 of the tariff act of 1842 was as follows:

SEC. 26. And be it further enacted, That the laws existing on the first day of June, eighteen hundred and forty-two, shall extend to and be in force for the collection of the duties *imposed by this act* on goods, wares, and merchandise, imported into the United States, and for the recovery, collection, distribution, and remission of all fines, penalties, and forfeitures, and for the allowance of the drawbacks *by this act authorized*, as fully and effectually as if every regulation, restriction, penalty, forfeiture, provision, clause, matter, and thing, in the said laws contained, had been inserted in and reenacted *by this act*. (Italics ours.)

The subsequent tariff act of 1846 was an extended one and prescribed new rates of duty upon importations. It, however, contained no provision for the collection of those duties, nor the distribution of penalties. It did not in any terms adopt the existing laws upon those subjects, nor make them in any wise applicable to the duties and penalties prescribed in the act of 1842. It repealed all acts and parts of acts inconsistent therewith. It was contended and shown before the Supreme Court that the provisions of section 26 of the act of 1842 were ex vi termini related to that act alone and to the duties and penalties therein prescribed, and, therefore, were claimed inconsistent with any other duties and penalties such as those prescribed in the act of 1846, wherefore the two acts it was argued could not be read together. The Supreme Court said (at p. 150):

It has been argued that this 3d section of the act of February 11, 1846, is expressly limited to the additional duties levied under the 17th section of the act of 1842; and therefore can not govern the distribution of those levied under the act of 1846. But so the 26th section of the act of 1842, which adopts former laws, applies them only to the duties and penalties levied under that act; and this is the only authority for applying any laws to the distribution of the penal duties now in question. The complainant is obliged to argue that, though limited in terms to that act, it applies to rates of penal duty afterwards substituted by the act of 1846, in place of those prescribed by the act of 1842. We have declared the argument sound; but it must be allowed its full and just effect. The implication is not that the laws for the collection and distribution of penalties, as they had existed at some prior period, or as they had been applicable to other penalties, were silently adopted by the act of 1846; but that

the laws for the collection and distribution of additional duties by way of penalty, as those laws existed when the act of 1846 was passed, must be deemed applicable to the new additional duty by way of penalty prescribed by that act.

To the same effect was Stuart et al. *v.* Maxwell (16 How., 57 U. S., 150). The tariff act of 1842 provided that on all articles manufactured from two or more materials the duty should be assessed at the highest rate at which any of its component parts might be chargeable. The tariff act of 1846 contained no such provision but fixed rates of duty for the articles in question, and repealed all acts and parts of acts repugnant to the provisions of that act. It was claimed that since the tariff act of 1846 made specific levies of duties on the article in question that the said provision of the tariff act of 1842 which varied those duties was inconsistent therewith and thereby repealed. The Supreme Court held the contrary and that the said provision of the act of 1842 was a rule of official performance in full force and effect and applicable to the rates prescribed by the tariff act of 1846 notwithstanding it was in terms related to the act of 1842. The court said:

The act of 1846 is a revenue law of the United States, and must be construed with reference to acts in pari materia, of which it forms only one part. This observance of a settled principle for the construction of statutes is absolutely necessary in the present state of the legislation of Congress on the subject of revenue. Without it, the public revenue could not be collected, and inextricable embarrassments and difficulties must constantly occur. We are obliged to look at the whole existing system, and consider the nature of the subject matter of the enactment under consideration, in its relations to that system, in order to pronounce with safety upon its repugnancy to, or consistency with, any particular act of Congress.

In the first place, then, it must be observed that the twentieth section of the act of 1842 does not impose any particular rate of duty upon imports. *It was designed to afford rules to guide those employed in the collection of the revenue, in certain cases likely to occur, not within the letter, but within the real intent and meaning of the laws imposing duties, and thus to prevent evasions of those laws.* * * *

It does not seem to be any more repugnant to the provisions of the act of 1846 than the great number and variety of provisions of the revenue laws, whose object was to cause the revenue to be regularly and uniformly collected without evasion or escape. *If this act of 1846 had in terms enacted the 20th section of the act of 1842, its provisions would not thereby have been rendered repugnant or conflicting.* This section would then only have *afforded a rule* by which it could be determined that certain articles did substantially belong to and were to be reckoned as coming under a particular schedule. This is apparent, not only from a consideration of the subject matter of the 20th section, when compared with the act of 1846, but from the fact that this 20th section actually made part of an act whose subject matter, and the outline of whose provisions, were the same as those of the act of 1846. The act of 1842 levied duties on certain imports specifically named. It declared certain other articles, also specifically named, to be exempt from duty, and it provided that a duty of twenty per cent ad valorem should be levied on all articles not therein provided for. Yet this 20th section made a consistent part of that act. The 26th section of the act of 1842 provides, "that the laws existing on first day of June, 1842, shall extend to and be in force for the collection of the duties imposed by this act on goods, wares, and merchandise imported into the United States, and for the recovery, collection, distribution, and remission of all fines, penalties, and forfeitures, and for the allowance of

the drawbacks by this act authorized, as fully and effectually as if every regulation, restriction, penalty, forfeiture, provision, clause, matter, and thing in the said laws contained had been inserted in and reenacted by this act."

The act of 1846 contains no corresponding provision, so that unless we construe the act of 1846 substantially as an amendment to the act of 1842, *merely altering its provisions so far as* the latter enactment is inconsistent with the former, the entire instrumentalities for the collection of the revenue under the act of 1846 would be wanting, and the duties which it requires to be paid could not be collected. It is quite apparent, therefore, that a great number and variety of provisions designed to protect the revenue against mistakes, evasions, and frauds, and to guard against doubts and questions, and to secure uniformity of rates in its collection, owe their present operation upon the duties levied by the law of 1846, to the vitality given to them by the law of 1842, and must be considered now to be the law because the act of 1842 made them, in effect, a part of its enactments, and because the act of 1846 *does not interfere with that enactment by which they were made so.* And it must be further observed, that these provisions of the 20th section of the act of 1842 are of the same nature as those thus left in force under the 26th section of the act of 1842, having been designed to remove doubts, to promote uniformity, and to check evasions and frauds.

There is nothing, therefore, in the general scope of the act of 1846 repugnant to the rules prescribed in this 20th section of the act of 1842. * * *

Thus the 26th section of the act of 1842, already cited, adopts existing laws for the collection of duties ''imposed by this act,'' for the collection of penalties and remission of forfeitures, and the allowance of drawbacks "by *this act* authorized." Yet, as has already been said, it is by force of this adoption that the duties and penalties under the act of 1846 are collected. It is manifest that the structure of the revenue system of the United States is not such as to admit of this exact and rigid interpretation; that the real intention of the legislature can not thus be reached. The true interpretation we consider to be this: the 26th section of the act of 1842 having reenacted the then existing laws, and applied them to the collection of duties levied by that act, when Congress, by the act of 1846, *merely changed the rates of duty, without legislating concerning their collection, the laws in force on that subject are to be applied;* and this application is not restrained by the fact, that, when reenacted by the act of 1842, they were declared to be so for the purpose of collecting the duties *by that act imposed.* The new duties merely take the place of the old, and are to be acted on by existing laws as the former duties were acted on; and among these existing laws is that which affords a rule of denomination, so to speak, which determines under what designation in certain cases a manufacture shall come, and how it shall be ranked; when this has been determined, the act of 1846 levies the duty. (Italics ours.)

Wherefore it seems clear that paragraph Q not being inconsistent with any provision of the act of 1916 and being a rule for the guidance of customs officers should be read in connection therewith.

The legislative conspectus here presents, when reading together the two acts, 1913 and 1916, the substitution of the paragraphs of the latter act relating to the subject of dyestuffs for those upon that subject in the act of 1913. The fact that the legislation concerns the same subject matter and relates to the dutiable status thereof in each act, concludes the question of the intention of Congress as to the amendatory character of the latter act; and, being so intended its amendatory effect expressly or impliedly extends to all parts of the act of 1913 of which paragraph Q is one. Were

not this the constructive result, the provision of section 502 of the act of 1916 impliedly continuing in force "so much" of the earlier act "*or any existing law or parts of law,*" as were not inconsistent with the act of 1916, would so effect.

Is the contention that this act by its terms shows an intention to segregate goods already imported and in warehouse from those which shall be subsequently imported. borne out by the terms of the statute? This seems to be solved by determining the sense in which the words "when imported from any foreign country," etc., are employed in section 500. We think that these words are employed with the purpose of indicating the origin of the goods, as from a foreign country, rather than to indicate the time of their importation. Goods may be deemed imported when they are brought within any port of the United States, but the term was obviously not so employed here, for duties are not at that moment and concurrently with their being thus imported, collected. Something more must be done. An entry and appraisement must be made before collection can be had. The word "when" as used in this paragraph should be read as meaning "which are," and as having no purpose to change the time or condition under which a collection of revenue is to be had.

That this is the sense in which these words are thus employed is apparent when we turn to the act of 1913 and note that precisely the same use is made of the words "when imported from any foreign country" in the enacting clause of that act. Yet that this provision was not intended to limit the levying of the tax under the act of 1913 to such goods as thereafter were imported was manifest from the fact that subsequent provisions are made that include within its terms all goods previously imported and upon which duty had not been assessed. Unless, therefore, there was palpable conflict between the two provisions, paragraph Q of section 4, and the enacting clause of the act of 1913, the words "when imported" must have been used in the sense in which we have indicated above.

It will be noted in passing that if the contention of the importers be sound, that paragraph Q is not to be read as a part of the act of September 8, 1916, it must follow that none of the administrative provisions and provisions for forfeiture and drawback, penalties, and other provisions calculated to arrest frauds in the customs provided for in section 4 of the act of 1913 can be read in connection with and applicable to the collection of duties upon those articles pre- scribed in the act of 1916. Reductio ad absurdum.

Inasmuch as there was no payment of duty nor the issuance and delivery of any permit of delivery until after the 8th day of September, 1916, under the provisions of paragraph Q the importers are not herein entitled to recovery.

Another ground urged by the Government in this case is, assuming that paragraph Q is not to be read in connection with the act of September 8, 1916, that until the goods enter into the commerce of the country by unconditional permit of delivery, whereby they pass out of the customs custody and into that of the importer, they are subject to the laws of Congress affixing rates of duty. That point is fully discussed in United States v. Cronkhite Co. (9 Ct. Cust. Appls., 129; T. D. 37980), this day decided, and, therefore, not here repeated. The result of that conclusion affords another ground, upon the facts of this case, for affirmance of the decision of the board herein.

*Affirmed.*

### DISSENTING OPINION.

SMITH, Judge: I am sorry that I disagree with my brother judges in this case and that I must respectfully dissent from the conclusion reached in the prevailing opinion.

The act of September 8, 1916, which went into effect September 9, 1916, imposes a duty of 30 per cent ad valorem on natural alizarin and indigo, and colors, dyes, and stains derived from certain products. It contains no provision subjecting goods of the kind mentioned which were imported prior to September 9, to the duties therein provided, unless it be held that paragraph Q, of the act of 1913, can be read into the act of September 8. If paragraph Q were an administrative provision of the customs law, it might well be held to have been continued in effect notwithstanding its omission from the act of September 8, but as the subject matter of that provision was not dealt with by the administrative act of June 10, 1890, or by any of the acts amendatory thereof and is wholly excluded from section 3 of the act of 1913, which expressly amended the administrative act of June 10, 1890, it can not be regarded as an administrative provision.

Paragraph Q is a dutiable provision, that is to say, a provision which determines the duties. It was enacted as section 33 of the act of 1897, and as section 29 of the act of 1909 just as it was repeated and reenacted as paragraph Q of section 4 of the act of 1913. It was not enacted as a part of the special tariff act of September 8, 1916, and therefore can no more be considered as a part of that act than any other dutiable provision of previous tariff acts.

The decision of the United States v. Goodsell Co. (84 Fed., 439) does not decide this case. The act of 1894 which was there involved contained a provision which was construed by the court to be the same as that contained in the act of 1883, which expressly provided that goods in public stores or in bonded warehouses should be subjected to the same duty as if they were imported subsequent to the

passage of the act. I do not agree that the provision of the act of 1894 was the same as the act of 1883, but whether it was or not the fact remains that it contained an express provision which was held to mean that goods imported prior to the act should nevertheless pay the duties thereby prescribed if in warehouse or in public stores at the time the new act went into effect.

In the case of Hartranft *v.* Oliver (125 U. S., 525) the goods were held to be *in public stores* and therefore subject to the duties of the tariff act of 1883, inasmuch as that act expressly provided that goods in public stores should pay the duties which it imposed.

The act of September 8, 1916, laid the duty on dyestuffs, imported; that is to say, on dyestuffs brought into this country subsequent to its passage and laid no duty on goods imported prior to its passage. To subject goods previously imported to the operation of the act required a special provision to that effect just as it did in *1897, 1909, and 1913, and just as it did in 1883 and 1894.* No such provision having been incorporated we can not read it into the act as it relates to rates of duty and not to customs administration.

In my opinion the act of September 8, 1916, was an absolutely independent piece of legislation and except in cases where the amendment was *expressly* made therein there was no intention to amend previous legislation. Section 16 expressly amends sections 3167, 3172, 3173, and 3176 of the Revised Statutes as amended. Section 22 expressly makes certain provisions of prior internal-revenue laws applicable to the provisions of the new law.

Section 402 of Title IV amends sections 42, 43, and 45 of the act of October 1, 1890. Section 404 of the same title expressly amends section 3255 of the Revised Statutes as amended, and section 406 of the same title expressly amends section 3354 of the Revised Statutes as amended. *Section 502 of Title V expressly amends paragraphs 20, 21, 22, and 23 of paragraph 1 of Schedule A and also paragraphs 387, 394, 452, and 514 of the tariff act of 1913. Section 600 of Title VI expressly amends paragraph 322 of Schedule M and paragraph 567 of the free list of the tariff act of October 3, 1913, so as to impose a duty on certain kinds of printing paper valued above 2½ cents per pound instead of 5 cents a pound.*

Congress having by the act of September 8, 1916, expressly amended previous laws and *especially having amended various paragraphs of the tariff act of 1913, and not having expressly amended any of the paragraphs on dyestuffs,* convinces me that the dyestuff provision was an independent tariff provision and was not intended as an amendment of the tariff act of 1913. In other words, having expressly amended certain provisions it can not be said that it intended to amend others in the absence of an express statement to that effect.

The clear purpose of the dyestuff provision in the act of 1916 was not so much revenue as *protection for the dyestuff industry*. The war with Germany cut off our supply of dyes and consequently Congress found it necessary to foster that industry, and Congress having that as its objective it can hardly be argued with much force that it intended to impose additional duties on dyestuffs brought into the country prior to the passage of the act of September 8, 1916, inasmuch · as such additional duties would cut no figure in the development of the domestic dye industry. As the provision for dyestuffs in the act of 1916 known as Title V was not amendatory of the act of 1913, and as it contained no provision subjecting to the duties therein prescribed goods in bond or public stores previously imported, it follows, I think, that the merchandise under consideration is not dutiable thereunder. United States *v.* Boyd (24 Fed., 692–694); Arnold *v.* United States (13 U. S., 103, at p. 119); United States *v.* Lyman (26 Fed. Cas., 1024, at p. 1031); United States *v.* Aborn (24 Fed. Cas., 753, at p. 754); Prince *v.* United States (19 Fed. Cas., 3331, at p. 1332).

I am of the opinion, therefore, that the decision of the Board of General Appraisers should not be affirmed, but reversed.