UNITED STATES *v.* CRONKHITE CO. (No. 1912).[1]

1. WITHDRAWAL, WHEN COMPLETE—SIGNATURE OF NAVAL OFFICER TO PERMIT OF DELIVERY.

Merchandise is not "imported" until it has passed beyond the custody and control of the customs officials and into the custody and control of the importer, his agent or consignee, thereby becoming a part of the body commerce of this country.—Five Per Cent Cases (6 Ct. Cust. Appls., 291; T. D. 35508). So long as goods remain in the custody and control of the officers of the customs they are to be regarded as in customs custody so as to be affected by any new legislation in relation to the duties that Congress may see fit to adopt. Withdrawal from the custody of the customs and introduction into the body commerce requires payment of duties and the due delivery to and receipt by an importer of an unconditional permit of delivery. Since a permit of delivery has no legal efficacy until signed by the naval officer, withdrawal of bonded merchandise under a permit of delivery dated September 8, 1916, but signed by the naval officer and delivered to the importer September 9, 1916, was not made on September 8.

---

[1] T. D. 37980 (36 Treas. Dec., 333).

2. CONSTRUCTION, PARAGRAPH Q OF SECTION 4, TARIFF ACT OF 1913, AND REVENUE
ACT OF SEPTEMBER 8, 1916.
There being no conflict between paragraph Q of section 4, tariff act of 1913, and
the revenue act of September 8, 1916 (39 Stats., 756), the paragraph was not repealed
by the revenue act. Nor should they be regarded as separate and independent
of each other. The principle of paragraph Q, that goods in bond shall be sub-
jected to the rate of duty in force at the time of withdrawal and not to that in force
at the time of entry should be applied in the administration of the revenue act.—
Vandergrift & Co. v. United States, decided concurrently herewith (9 Ct. Cust.
Appls., 112; T. D. 37978). Consequently, merchandise which was entered and
bonded before, but withdrawn after, the revenue act went into effect is ratable for
duty under the revenue act of 1916, and not under the tariff act of 1913.

## United States Court of Customs Appeals, April 1, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8149 (T. D. 37579).

[Reversed.]

*Bert Hanson,* Assistant Attorney General (*Irving Washburn,* special attorney, of
counsel), for the United States.
*Walter Evans Hampton* for appellees.

[Oral argument Oct. 30, 1918, by Mr. Hanson and Mr. Hampton.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

The considerations had in F. B. Vandegrift Co. v. United States
(9 Ct. Cust. Appls., 112; T. D. 37978) are equally pertinent in this
appeal. The differentiating facts in the two cases require, however,
separate consideration. In this case the merchandise was shipped
from Japan and came into the country at Tacoma, Wash., on
July 17, 1916. Immediate transportation entry was made and the
goods shipped in bond without appraisement to Jersey City, which
is within the limits of the port of New York. They arrived at
Jersey City on the morning of September 8, 1916, and were entered
on that day as free of duty. Formal entry for consumption was
made and accepted by the collector of customs. The entry paper,
which is in evidence, bears date of September 8, 1916, the examiner
having reported these goods entitled to free entry as indicated in
paragraph 514 of the tariff act of 1913. The collector afterwards
sent the invoice back to the appraiser for review and report, under
the act of September 6, 1916. The appraiser then made a supple-
mental report that the merchandise should be returned as indicated
at 30 per cent under the act of September 8, 1916, and the entry
was liquidated on January 28, 1917, under that classification. The
permit for delivery of the merchandise is dated "Custom House,
September 8, 1916," and below a description of the goods is signed
by the deputy collector. Underneath appears the signature of the
deputy naval officer, with the figures "9/9/16." This permit, which
was evidently signed by the naval officer, was on September 9, 1916,

delivered to the importer on that day. It may, therefore, be assumed as a fact in the case that the permit of delivery was not signed by the naval officer or delivered to the importer until September 9, 1916. The date of the actual delivery of the goods to the importer is not shown by the record. Neither does the record disclose when any of the statutory requirements attending a permit of delivery by other customs officials were performed.

The contention of the importer in this case is that the entry of the goods, as provided, was completed with the filing of the entry paper, and that the permit of delivery when signed by the collector was complete without having been countersigned by the naval officer or having been attended by other legal requirements.

It may be noted in passing that the drums in which the merchandise was contained are now conceded to be dutiable by both parties to the record. This fact was overlooked by the Board of General Appraisers and the customs officials. It is equally conceded that the duties upon the drums, however small, were not tendered or paid on September 8, 1916. It may be assumed, therefore, for the purpose of decision that the duties were not paid and the permit of delivery was not signed by the naval officer on September 8, 1916. Upon this record and statement of facts, was the importation completed on September 8, 1916? If paragraph Q is here applicable, was that paragraph complied with? We think both questions must be answered in the negative.

There is a long and consistent line of decisions upon this subject, commencing at least with the tariff act of 1897. Paragraph 33 of that act was in all essential particulars in the language of paragraph Q of the act of 1913. What constituted an "importation," or rather when could goods be said to have been "imported from a foreign country" and what was necessary to constitute an "entry" under said paragraph 33, have been the subject of frequent adjudication. The board gave consideration to the same on September 7, 1900, in G. A. 4762 (T. D. 22481). Shortly thereafter the same subject received attention in G. A. 4909 (T. D. 22618), decided November 14, 1900. Similar decision was had by the board in G. A. 5004 (T. D. 23317), October 17, 1901, and in G. A. 5870 (T. D. 25860), December 19, 1904. In these various decisions the doctrine was uniformly adhered to that so long as goods remained in the custody and control of the officers of the customs they are to be regarded as in customs custody so as to be affected by any new legislation in relation to the duties that Congress may see fit to adopt. What constituted such withdrawal from the custody of the customs and introduction into the body of commerce was held to require payment of duties and the due delivery and receipt by an importer of an unconditional permit of delivery. Section 33 of the tariff act of

1897, thus construed, was reenacted by the tariff act of 1909, and was again reenacted as paragraph Q of the tariff act of 1913 in essentially the same language as that so construed. This *legislative adoption should control its interpretation.

While it was held by the board, and as it is here maintained by the importer, that the signing of a permit by a naval officer is unimportant and not essential, it has long since been pointed out by the Board of General Appraisers that by the language of section 2 of the act of June 5, 1894, the permit of delivery has no legal efficacy until it is so signed by the naval officer. That act reads:

The amount of the estimated duties having been first paid or secured to be paid, pursuant to the provisions of this title (XXXIV) the collector shall, together with the naval officer, where there is one, or alone where there is none, grant a permit to deliver the merchandise whereof entry has been so made, *and then, and not before*, it shall be lawful to deliver the merchandise.

Not only is such signing necessary to the validity and legal efficacy of the permit of delivery, but also compliance with other statutory requirements is necessary before the goods can be said to have passed out of the customs custody and into the custody and control of the importer. Thus section 2870 of the Revised Statutes provides:

All persons shall specify, as particularly as may be, the merchandise to be delivered; namely, the number and description of the packages, whether, trunk, bale, chest, box, case, pipe, hogshead, barrel, keg, or any other packages whatever, with the mark and number of each package, and, as far as circumstances will admit, the contents thereof, together with the names of the vessel and master in which, and the place from whence, they were imported; and *no merchandise shall be delivered* by any inspector or other officer of the customs *that does not fully agree with the description thereof in such permit.*

Congress also with reference to this subject has enacted by section 2882 of the Revised Statutes as follows:

R. S. 2882. No merchandise brought in any vessel, from any foreign port or place, requiring to be weighed, gauged, or measured in order to ascertain duties thereupon, shall, without the consent of the proper officer, be removed from any wharf, or place, upon which the same may be landed or put before the same shall have been so weighed, gauged, or measured * * * by or under the direction of the proper officer, and if any such merchandise shall be removed from such wharf or place, unless with the *consent of the proper officer, obtained before the same shall have been so weighed, gauged, or measured* * * * the same shall be forfeited and may be seized by any officer of the customs or inspection.

It is evident that perforce these statutes Congress has, after the permit of delivery has been issued, placed certain goods in the custody of the customs officials until after certain official acts are performed, denied even to customs officers the power to release this possession until after those acts are performed, and laid the penalty of forfeiture upon the owner for an infringement of these laws.

The act of June 5, 1894, section 2, supra, has, in substance, since the foundation of the Government, been the rule of law concerning permits of delivery. It was section 28 of the act of 1799, 1st Stat. The unlading without such permit upon behalf of the owners of vessels and the taking into possession of merchandise by the importer without such permit received attention as early as February, 1859, in The Ploughboy (19 Fed. Cas., 884, case 11229). The case is relevant here in that it has been maintained upon behalf of the importer and emphasized by the Board of General Appraisers that the importer should not be penalized on account of lack of prompt action upon part of the naval officer in signing or delivering the permit of delivery. In the case cited it was urged upon the court that the fact that the collector was sought and could not be found at night in order to sign the permit of delivery was justification. The court held, however, that such did not avoid compliance with the statute, and ordered the forfeiture of the vessel.

It seems to this court that the case decided by the Circuit Court of Appeals, Second Circuit, United States *v.* N. L. Goodsell Co. (84 Fed. Rep., 439) is conclusive of this case. That decision was predicated on Hartranft *v.* Oliver (125 U. S., 525), quoting the same with approval. The permit of delivery had been duly signed and issued before August 28, 1894, the date upon which the tariff act of 1894 went into effect. The goods, however, were not examined until August 29, 1894, by the examiner, whose indorsement of his initials thereupon was made upon that date. The goods were never in any bonded warehouse but came directly from the vessel to the wharf, where they were sold by the importers at public auction. It was the contention of the importer in the case that the owner had no control over them until the permit of delivery had been presented to the examiner and duly indorsed by him. It was held that until these acts were done the goods did not pass from the customs custody into the commerce of the country, and therefore were subject to all provisions of the act of August 28, 1894, which took effect while the goods were so situated. In this case the conceded duties due had not been paid nor had a valid permit of delivery been granted.

Assuming, however, the contention of the appellee to be true that paragraph Q is not to be read and applied in connection with the act of September 8, 1916, there arises the question in this case, when are goods "imported from a foreign country," within the provisions of the act of September 8, 1916, levying duties upon certain goods therein enumerated "when so imported." This question has received the attention of the customs tribunals and courts for many years and has so frequently been adjudicated that it may well be said to be stare decisis.

Tariff laws have usually been enacted for protective as well as revenue purposes. The portion of the revenue act herein reviewed

is distinctively a protective measure. Bearing the purpose of the act in mind, it would seem obvious that the time when it was necessary that it should go into effect in order to become effective was when goods entered into the commerce of the country. Until then, that they would enter into the commerce of the country was not certain, and their exact competitive force, when entering the commerce of the country, was as yet undetermined by reason of the fact that a greater or lesser amount of duties might be levied thereupon. Accordingly we must naturally assume that such merchandise would not be deemed by Congress to be "imported" within the language of the act until it had passed beyond the custody and control of the customs officials and into the custody and control of the importer, his agent or consignee, thereby becoming a part of the body commerce of this country. The doctrine is concisely stated by this court in the Five Per Cent cases (6 Ct. Cust. Appls., 291; T. D. 35508), as follows:

> The purpose of tariff laws, generally speaking, is to provide that the dutiable status of imported merchandise is to be determined at the time it enters into the commerce of the country. Clearly, with respect to the class of merchandise now under consideration, that time was when entry for consumption was made and delivery permits issued. Marriott v. Brune (9 How., 50 U. S., 619), Fabbri v. Murphy (95 U. S., 191), Hartranft v. Oliver (125 U. S., 525), United States v. Burr (159 U. S., 78, 83–84), American Sugar Co. v. United States (202 U. S., 563), Franklin Sugar Co. v. United States (202 U. S. 580), Faber v. United States (221 U. S., 649), United States v. Goodsell (84 Fed., 439), Mosle v. Bidwell (130 Fed., 334), United States v. Hartwell (142 Fed., 334), American Cigar Co. v. United States (146 Fed., 484), Gump v. United States (3 Ct. Cust. Appls., 137; T. D. 32384).

Now, while paragraph J, subsection 7, without reference to subsections Q and S, relates to duties on merchandise *thereafterwards imported*, we think when taken together these provisions should be construed to include merchandise brought here before the passage of the act, under bond for warehousing but which thereafter is entered for consumption. So long as merchandise remains under bond for warehousing in the tariff sense and for assessment of duties, its importation has not been completed. Indeed, it may never be completed; hence warehoused goods are for tariff purposes "future importations."

The doctrine that goods are not imported within the purview of that term as established in the enacting clauses of tariff acts until they have by due pursuit of the customs requirement passed out of the custody of the Government into the custody of the importer is precisely stated in Hartranft v. Oliver (125 U. S., 525) as follows:

> Ordinarily, goods in the custody and control of officers of the customs are placed in a public store or bonded warehouse, and thus the designation of the goods as thus placed is, in the legislation of Congress, in effect a designation, and no more, of their being in such custody. But goods on board of a ship, in charge of a customhouse officer, preliminary to their removal to a public store or a bonded warehouse, and during the time necessary for that purpose, are in like custody, and so are, within

the spirit and intent of the law, subject only to such duties as are leviable when the goods are freed from such custody. So far as the Government is concerned, they are in the same position as if technically in a public store or bonded warehouse. When in either of these places, they can not be removed without a permit from the collector. When on shipboard, in charge of a customhouse inspector, they are in the same condition, and can not be removed without a like permit. * * *

We are, therefore, of opinion that, within the spirit and intent of the 10th section of the act of March 3, 1883, the goods were not chargeable with duties, whilst on board the bark, in custody of an officer of the customs, at any greater rate than they would have been chargeable if in custody of such officer in a public store or bonded warehouse of the Government; and that therefore duties were only leviable on the goods by the act which went into effect on the first of July, 1883. The intent of the legislature is to be followed, even if not strictly within the letter of the statute.

*Reversed.*

DISSENTING OPINION.

SMITH, Judge: For the reasons stated by me in Vandegrift &. Co. *v.* United States (9 Ct. Cust. Appls., 112; T. D. 37978; suit No. 1904), I am of the opinion that the decision of the Board of General Appraisers should not be reversed,. but affirmed, and therefore dissent.