Headley Asphalt Division, Sinclair Refining Co. *v.* United States (No. 4038)[1]

United States Court of Customs and Patent Appeals, March 1, 1937

Albert E. Van Dusen and Lionel P. Marks for appellant.

Joseph R. Jackson, Assistant Attorney General (Marcus Higginbotham, Jr., special attorney, of counsel), for the United States.

[Oral argument February 11, 1937, by Mr. Marks and Mr. Jackson]

Before Graham, Presiding Judge, and Bland, Hatfield, Garrett, and Lenroot, Associate Judges

Lenroot, Judge, delivered the opinion of the court:

This appeal brings before us for review a judgment of the United States Customs Court, First Division, one judge dissenting, overruling the protest of appellant against the classification and assess-

[1] T.D 48873.

ment with duty at one-half cent per gallon, by the collector at the port of Philadelphia, of 110,913 gallons of Mexican crude oil in bulk, by virtue of section 601 (c) (4) of the Revenue Act of 1932. The protest claimed exemption from duty on the following grounds:

1. That the said oil was exempt from duty as fuel supplies under the provisions of article 125 of the Customs Regulations.

2. "* * * that the oil in question was never imported into the United States, within the terms of the Revenue Act of 1932, Section 601, and the Tariff Act of 1930, Section 1, since it was never unloaded and never left customs custody while within the limits of the United States."

The cause was submitted to the trial court upon the following stipulation:

It is hereby stipulated and agreed by and between the attorneys for the respective parties hereto that the above entitled suit be submitted to the Court for determination on the basis of the Collector's Report and the record herein.

It is agreed that the collector's Report may be admitted in evidence.

It is also stipulated and agreed that the certificate or affidavit of the Deputy Collector of Customs, dated October 16, 1935, hereto attached, may be admitted in evidence.

The case is respectfully submitted upon this stipulation and the record and all the official papers in the case.

\* \* \* \* \* \* \*

Section 601 of the Revenue Act of 1932, insofar as is here pertinent, reads as follows:

SEC. 601. EXCISE TAXES ON CERTAIN ARTICLES.

(a) In addition to any other tax or duty imposed by law, there shall be imposed a tax as provided in subsection (c) on every article imported into the United States unless treaty provisions of the United States otherwise provide.

(b) The tax imposed under subsection (a) shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, except that—

\* \* \* \* \* \* \*

(c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer:

\* \* \* \* \* \* \*

(4) Crude petroleum, ½ cent per gallon; fuel oil derived from petroleum, \* \* \* and all liquid derivatives of crude petroleum, except \* \* \* ½ cent per gallon; \* \* \*.

Section 446 of the Tariff Act of 1930, upon which appellant also relies, reads as follows:

SEC. 446. SUPPLIES AND STORES RETAINED ON BOARD.

Vessels arriving in the United States from foreign ports may retain on board, without the payment of duty, all coal and other fuel supplies, ships' stores, sea stores, and the legitimate equipment of such vessels. Any such supplies, ships'

stores, sea stores, or equipment landed and delivered from such vessel shall be considered and treated as imported merchandise: *Provided*, That bunker coal, bunker oil, ships' stores, sea stores, or the legitimate equipment of vessels belonging to regular lines plying between foreign ports and the United States, which are delayed in port for any cause, may be transferred under a permit by the collector and under customs supervision from the vessel so delayed to another vessel of the same line and owner, and engaged in the foreign trade, without the payment of duty thereon.

Section 432 of said tariff act reads as follows:

SEC. 432. MANIFEST TO SPECIFY SEA AND SHIP'S STORES.

The manifest of any vessel arriving from a foreign port or place shall separately specify the articles to be retained on board of such vessel as sea stores, ship's stores, or bunker coal, or bunker oil, and if any other or greater quantity of sea stores, ship's stores, bunker coal, or bunker oil is found on board of any such vessel than is specified in the manifest, or if any such articles, whether shown on the manifest or not, are landed without a permit therefor issued by the collector, all such articles omitted from the manifest or landed without a permit shall be subject to forfeiture, and the master shall be liable to a penalty equal to the value of the articles.

The collector's report referred to in the stipulation states in part as follows:

This oil was imported in the Nor. S. S. "Meline", an oil burning tanker. The manifested quantity of oil was 2,820,092 gallons, and the landed quantity was 2,806,338 gallons, of which 2,695,425 gallons were discharged into shore tanks and 110,913 gallons were pumped from the cargo tanks into the bunker tanks for use on the vessel as fuel. The oil pumped into the bunker tanks was included in the cargo as manifested and was also included in the quantity covered by the entry, but was not included in the vessel's Stores list.

The certificate of the Deputy Collector of Customs, referred to in the stipulation, reads as follows:

I, Luther Sterner, Deputy Collector of Customs in Charge, Wilmington, Delaware, Custom House, do hereby swear that, to the best of my knowledge and belief, the Norwegian SS. "*Meline*," which arrived at the port of Wilmington, March 10th, 1934, and subsequently discharged its cargo at the plant of The Texas Company, was, while discharging its cargo under continuous supervision of this office.

LUTHER STERNER,
*Deputy Collector of Customs.*

The entry papers show that the cargo of oil, including the oil here involved, was imported by appellant, and that at the time of entry it was the owner or ultimate consignee thereof.

The manifest referred to in section 432 does not appear in the files, nor is it referred to in the stipulation, but it is conceded that the report of the collector is correct in stating that said oil was not included in the vessel's "Stores list."

The trial court held (with respect to appellant's first claim that the oil was exempt from duty as fuel supplies retained on board) that obviously the fuel supplies contemplated by section 446 of the tariff

act are such as had an existence as fuel supplies on the arrival at the port of entry, and not merchandise which is part of the manifested cargo.

Counsel for appellant states his contention upon this point as follows:

The oil here in question was entered as cargo, it is true, but it was pumped into the ship's fuel tanks and became fuel supplies while the vessel was still in customs custody. The Act does not say expressly when the character of goods as fuel supplies or as cargo is to be determined. It *does* say, however, that *if* fuel is *"landed and delivered from such vessel"* it is to be treated as imported. The obvious inference is that fuel which is *not* landed is *not* imported, and it is clear that such was the intention of Congress. If what was meant is that the character of the goods as fuel supplies, ships' stores, or sea stores was to be determined from the manifest, then the second sentence of Section 446 was superfluous. Any landing of goods so manifested would be a violation of the customs laws, not an importation. The obvious intent was to leave the shipmaster some leeway as to how much of his cargo he should land and how much retain for the use of the ship. The quantity landed was alone to be taxed.

No implication can be drawn from section 446 that, because it pro-- vides that any supplies which are landed or delivered should be considered as imported merchandise, other supplies acquired by transfer from the cargo after arriving at a port should not be subject to duty. Section 432, relating to forfeiture of ship supplies in case of landing the same, applies only where such supplies are landed *without a permit from the collector*. Article 125 of the Customs Regulations of 1931, subdivision (f), expressly provides for a permit of the collector to land such supplies, and that in such case they shall be subject to entry and payment of duty. Thus section 432 is in harmony with section 446, and no anomaly exists.

We are in entire agreement with the trial court that, in order for ship's fuel supplies to be exempt from payment of duty, they must have had such existence on the arrival of the vessel at a port of entry, and not have been merchandise which is part of the manifested cargo. It is conceded that, at the time of the arrival of the S. S. *Meline* at the port of Philadelphia, the oil in question did not constitute a part of its fuel supplies and was not listed as such.

The next contention made by appellant is that, inasmuch as the oil was never unloaded and never left customs custody, it was never imported within the meaning of that word as used in section 601 of the Revenue Act of 1932, or as used with respect to the dutiable provisions of the Tariff Act of 1930.

This court has repeatedly passed upon this question. One of the later expressions of this court upon this question is found in the case of *United States* v. *Estate of Boshell*, 14 Ct. Cust. Appls. 273, T. D. 41884, wherein it was said:

The common ordinary meaning of the word "import" is to bring in. Imported merchandise is merchandise that has been brought within the limits of a port of

entry from a foreign country with intention to unlade, and the word "importation" as used in tariff statutes, unless otherwise limited, means merchandise to which that condition or status has attached.

A large number of cases were there cited in support of the rule stated.

In the case of *United States* v. *Field & Co.*, 14 Ct. Cust. Appls. 406, T. D. 42052, this court said:

> The importer contends that goods are not imported within the meaning of section 308 until after they have passed out of the custody and beyond the control of customs officials, and that, therefore, the six months' period for exportation prescribed by that section did not begin to run prior to the 11th of April, 1924, the date on which entry of the goods was made and a bond for their exportation executed.
>
> We cannot agree with that contention. Unless it clearly appears that Congress otherwise intended, the word "importation" means the bringing of goods within the jurisdictional limits of the United States with the intention to unlade them. * * * [citing authorities.]

Appellant relies largely upon the decision of this court in the case of *United States* v. *Cronkhite Co.*, 9 Ct. Cust. Appls. 129, T. D. 37980, wherein it was held that, under the statutes there involved, the word "imported" as used therein did not include merchandise which had not passed out of the custody and control of the customs officials. This case was discussed and distinguished by this court in the case of *Diana et al.* v. *United States*, 12 Ct. Cust. Appls. 290, T. D. 40295. In that case the court said:

> The meaning of the word "imported" with relation to statutes providing for importation of foreign merchandise and the assessment and collection of duties thereon has received much attention by the courts and administrative officers.
>
> The invariable conclusion has been that, in its ordinary statutory sense, the word "importation" means bringing merchandise into this country from the outside with intention to unlade, and that "imported" in like manner, when applied thereto, means merchandise to which that condition or status has attached. * * * [citing authorities.]
>
> *      *      *      *      *      *      *
>
> Much reliance is placed by importers on the opinion of this court in United States *v.* Cronkhite, supra. In that case, after disposing of the real issue upon the theory that the merchandise under consideration was dutiable under paragraph Q of the act of 1913, although previously imported, the decision arguendo proceeded to consider what would be the dutiable status of the importation if said paragraph Q were not applicable, and it was said that even in such a case the duties provided in the subsequently enacted statute would apply to merchandise theretofore imported. In a sense this discussion was obiter, but when the authorities relied upon to support it are consulted it will appear in effect that in each case the statutes passed upon and held applicable provided in terms that the duties thereunder should apply to merchandise in customs custody, and the obiter discussion, therefore, must be understood with that limitation. Our opinions in the Vandegrift and Five Per Cent Cases must be likewise understood.

We find nothing in any of the statutes here involved to indicate that the word "imported" should not be given its ordinary meaning

in tariff laws. As it is admitted that the oil here involved was brought into the port of Philadelphia with intention to unlade, it was subject to duty as assessed by the collector.

For the reasons herein stated, the judgment of the United States Customs Court is *affirmed.*