McLEAN *v.* HAGER, Collector, etc.

*(Circuit Court, N. D. California.   July 25, 1887.*

CUSTOMS DUTIES—OPIUM IN TRANSIT.
    Opium shipped on board a steam-ship at Honolulu, for Panama, by way of San Francisco, intended to be transferred, without landing, to another steamer at San Francisco, running to Panama, in connection with the steam-ship from Honolulu, and entered on the manifest and bills of lading, and reported to the collector, as being in transit for Panama, the owner having applied to the collector for a permit to make the transhipment, and offered to give the se-

curity prescribed by the statute, and a permit having been refused, was held not to be liable to duties,—and a seizure for non-payment of duties adjudged to be illegal. Sections 2502, 2931, and 2979, Rev. St., construed.

Demurrer to Complaint.

*T. D. Riordan,* for plaintiff.

*J. T. Carey,* U. S. Atty., for defendant.

Before SAWYER, circuit judge, and HOFFMAN, district judge.

SAWYER, J. The complaint alleges that plaintiff, on November 14, 1885, at Honolulu, shipped a quantity of opium prepared for smoking, on the steam-ship Mariposa, then lying in the port, *en route* for San Francisco; that said opium was shipped to Panama by way of San Francisco, that being the only route by which freight destined for Panama could be shipped at Honolulu for that port; that said freight was marked "In transit for Panama;" "and was entered on the steam-ship's manifest, and indorsed on the bill of lading, 'In transit for Panama;'" that said steam-ship arrived at San Francisco on November 22, 1885, and, thereafter, on November 25, 1885, said plaintiff tendered to said defendant, as collector of said port, an entry of said opium as required by law, for immediate transhipment by the steam-ship Colima, then in port, to Panama; that said collector refused to allow such entry, and refused to permit such opium to be transferred from said steam-ship Mariposa to said steam-ship Colima, for transportation to Panama, unless plaintiff would first pay the duties required by the laws of the United States to be paid on prepared smoking opium imported into the United States; that plaintiff declined to pay said duties, whereupon said 'defendant seized said opium while still upon said steam-ship Mariposa, and, afterwards, sold the same to pay said duties so claimed; that plaintiff did not intend to import said opium into the United States, but, on the contrary, it was his intention, and desire, to ship said opium to Panama; and at the time of the said arrival of said steam-ship Mariposa, at San Francisco, and of said seizure, said opium was in transit for Panama, and was not subject to the payment of any duty. It is, also, alleged, that said opium was domestic opium, prepared in San Francisco, and exported to Honolulu; that it was seized by the Hawaiian government as having been imported into Honolulu, in violation of the laws of that kingdom, and forfeited and sold to plaintiff upon condition, that it should be, immediately, sent out of the country. Plaintiff claims $4,000 damages.

The question is, whether this opium was liable to pay duties under the circumstances stated, and, whether it was lawfully seized, and sold for non-payment thereof.

Section 2502, Rev. St., as amended in 1883, provides, that "there shall be levied, collected, and paid upon all articles *imported from foreign countries,* and mentioned in the schedules herein contained, the rates of duties, which are by the schedule respectively prescribed, namely: * * * opium, prepared for smoking, and all preparations of opium, not specially enumerated or provided for in this act, ten dollars per pound; but

opium prepared for smoking, and other preparations of opium *deposited in bonded warehouses*, shall not be removed therefrom, for exportation, without payment of duties, and such duties shall not be refunded." 22 Rev. St. 491, 495.

If the opium in question was fairly within the meaning of this statute, then, it was liable to duty, and the seizure, for refusal to pay, and sale for non-payment, were lawful. But this opium was never, in fact, "deposited in any bonded warehouse," and there was no occasion to so deposit it. We do not find any statute that requires opium, or other goods situated as this was, to be so deposited, or any express provision requiring it to pay duties. It was never intended to be brought into the United States for consumption, or sale, there. It was never intended to enter into the commerce of the country. It was not imported into the United States in any proper sense of the term. It was shipped from one foreign port to another, by way of San Francisco, simply, because there was no other convenient means of forwarding it to its destination. It purported on the ship's manifest, and in the bill of lading, to be shipped from Honolulu to Panama, and to be only in transit, and it was so reported to the collector. The owner applied to the collector, not for permission to land it, and put it in a bonded warehouse, but for permission to transfer it from the steam-ship Mariposa to another ship, then in the harbor, bound for Panama, and running in connection with the Mariposa, thereby making the whole transit from Honolulu to Panama without landing at all. To land and bond the goods, and, then, take them out of the bonded warehouse, and reship, would be a useless double labor, and expense, which no statute called to our attention, appears to us to require. It would be casting an unnecessary burden upon commerce, expressly destined to be between two foreign ports, and performing an unneighborly act by our government towards adjacent friendly nations. The secretary of the treasury has prescribed rules for such cases under which he seems to consider the importing vessel, a bonded warehouse, for the occasion, his language being, "the importing vessel being considered the warehouse." Gen. Reg. 1884, art. 783, p. 331. Upon that idea he holds that duties should be exacted as if the opium had been deposited in a bonded warehouse, and the collector acted in accordance with that ruling. But we are unable to find any statutory authority for such proceedings. The statute prescribes what shall constitute a bonded warehouse, and how it is to be established and qualified for the service. No such proceedings were had to make the Mariposa a bonded warehouse, or to qualify her to serve in that capacity.

Section 2776, Rev. St., provides that "any vessel may proceed with any merchandise brought in her, and, in the manifest delivered to the collector of customs, reported as destined for any foreign port, from the district within which such vessel shall first arrive to such foreign port, *without paying or securing the payment of any duties upon such merchandise as shall be actually re-exported in the vessel.*" Then, it provides, what shall be done to secure the carrying away of the goods. Had the Mariposa been on a voyage from Honolulu to Panama, touching at the port of

San Francisco, having this opium on board, in transit, from the former to the latter port, in precisely the same manner, as in this case, can there be a shadow of doubt, that upon complying with the statutory condicions, she would have been entitled under this section to proceed with the opium to Panama, without either paying or securing the payment of the duties imposed upon such merchandise, when imported into the country, in the ordinary way, for the purposes of the commerce of the country? We think not.

So it appears to us, that section 2979 provides, with little less explicitness, for the case in hand, where merchandise is brought into port in transit from one foreign port to another, upon a vessel which is to proceed no further, and intended not to be landed, but transferred to another vessel, ready to receive it, to be transported to and landed at another foreign port. Says the statute:

"If the owner, importer, consignee, or agent of any merchandise, on which duties have not been paid, shall give the collector satisfactory security, *that the merchandise shall be landed out of the jurisdiction of the United States*, in the manner required by the laws relating to exportations for the benefit of drawback, the collector, and naval officer, if any, on the entry to re-export the same, shall, upon payment of the appropriate expenses, permit the *merchandise, under the inspection of the proper officers, to be shipped* WITHOUT THE PAYMENT OF ANY DUTIES THEREON." Rev. St. § 2979.

This section appears to exactly cover this precise case. Here were goods in transit from one foreign port to another, *not intended to be landed* in San Francisco. It was so expressed on the manifest, and on the bill of lading, and so reported to the collector of customs. The owner offered to give the security required, that the "merchandise should be landed out of the jurisdiction of the United States," and asked a permit to transfer it to a ship, in port, ready to sail, and bound to the port of destination.

But the collector, acting upon the ruling of the secretary, refused to grant a permit, without payment of the ordinary duties imposed upon goods imported into, and landed in, the United States, although this section of the statute expressly says, that the collector shall, "upon payment of the appropriate expenses, permit the merchandise, under the inspection of the proper officers, to be shipped *without the payment of any duties.*" It must be remembered, that these goods were *never, in fact, landed and placed in a bonded warehouse*, and no statute has been called to our attention, that appears to us to require that goods so situated, should be landed, or should be placed in a bonded warehouse. And unless this opium was "*deposited in a bonded warehouse*," within the meaning of the statute, the provisions of section 2502, Rev. St., as amended in 1883, do not apply.

We cannot attribute to congress an intention to place so important an obstruction upon the commerce of friendly neighbors,—a partial confiscation of the property of their citizens, under the circumstances surrounding this case,—without a more explicit expression of such intent than is found in any provision of the statutes brought to our notice.

The rule is, undoubtedly, established, that when goods arrive within the destined port of entry *with intent* that they shall be unladen, and become a part of the commerce of the country, the liability to pay duties attaches. *U. S.* v. *Twelve Thousand Three Hundred and Forty-Seven Bags of Sugar*, 2 Abb. (U. S.) 423, note. Says the Court in *U. S.* v. *Ten Thousand Cigars*, 2 Curt. 437 : "An importation is complete when goods are brought within the limits of a port of entry, *with the intention of unloading them there.*" In *The Gertrude*, 3 Story, 71, the court says the revenue laws "refer, also, to goods intended to be introduced into the country for sale and consumption, or for the general purposes of commerce.   *   *   * To constitute an importation, within the meaning and intent of the laws, the arrival must be voluntary, *with the intent to import them.*"

The qualifications mentioned in the foregoing cases are not mentioned in *U. S.* v. *Vowell*, 5 Cranch, 372; *Arnold* v. *U. S.*, 9 Cranch, 119; and *Meredith* v. *U. S.*, 13 Pet. 494. In the latter it is said that the right of the government to the duties accrues "at the time when the goods have arrived at the *proper port* of entry." That is to say, *when liable to duties* at all, the right attaches at the time indicated. In the cases cited from the supreme court, there was no occasion to mention the qualification stated in the cases cited from the circuit courts. But, in this case, the goods were not intended to be landed, or imported for the purpose of the commerce of this country. This opium was professedly shipped at Honolulu, for Panama, by way of San Francisco, and purported on the manifest and bills of lading, and so reported to the collector, to be in transit,—to be transhipped without landing. There was no intention to import it into the United States, for any purposes of the country, in any just commercial sense, and, consequently, the right to duties never attached. The *proper port of entry*, for the purposes of commerce, was Panama, and the only burdens imposed and provided in such cases, by the statutes referred to, were for the purposes of securing the landing of the goods beyond the borders of the United States, so that they should not enter clandestinely into the commerce of the country of which it had not yet become a part.

If wrong in the position taken by him as to the liability of the opium to duties, the United States attorney insists that plaintiff cannot recover because he did not first appeal to the secretary of the treasury, and take the proceedings required by section 2931, Rev. St., before instituting his suit. *This is not a suit to recover duties improperly exacted.* It is a suit for damages resulting from a trespass alleged to have been illegally committed,—a trespass by unlawfully seizing goods not liable to seizure. The goods never were entered, and not desired to be entered, for the ordinary purposes of the commerce of the country. They were, merely, in transit, and not liable to duties upon the conditions under which they were seized and sold. We do not think the section of the statute relied on applies.

It follows that the demurrer must be overruled, with leave to answer, and it is so ordered.