UNITED STATES *v.* UNITED CIGAR STORES CO. (No. 266).[1]

PHILIPPINE CIGARS TRANSSHIPPED AT HONGKONG, A DIRECT SHIPMENT.

In the enactment of the provisions of the tariff act of 1909 that relate to commerce between the United States proper and the Philippine Islands, the Congress will be presumed to have had in mind the actual requirements of trade in the Philippines, as these may call for transshipment of merchandise; and having in view, too, the recognized benevolent intent of legislation affecting the archipelago, that shipment must be deemed a direct shipment from the Philippines to the United States when the consignment was forwarded on a through bill of lading from Manila to New York, but by reason of a trade requirement was transshipped at Hongkong; and so the goods fell within section 5, tariff act of 1909, making them free of duty.

United States Court of Customs Appeals, April 10, 1911.

APPEAL from a decision of the Board of United States General Appraisers, G. A. 7026 (T. D. 30643).

[Affirmed.]

*D. Frank Lloyd,* Assistant Attorney General (*Charles Duane Baker* on the brief), for the United States.

*Max J. Kohler, Sol M. Stroock,* and *Henry L. Moses* for appellee.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

SMITH, Judge, delivered the opinion of the court:

A verified consular invoice dated Manila, P. I., June 25, 1909, shows that the United Cigar Stores Co., a corporation organized under the laws of New Jersey, purchased at Manila from the Philippine Co. (Ltd.), at a cost of $3,387.25, inclusive of packing and other charges, 225,000 cigars manufactured from tobacco the growth and product of the Philippine Islands. It appears from the bill of lading in evidence

that the cigars so purchased were delivered at Manila on June 25, 1909, to the Pacific Mail Steamship Co. for carriage from that place to New York, shipment thereof to be by the steamship *Korea* to San Francisco and thence to destination by transshipment. As the *Korea* had left Manila on June 19, 1909, and was lying at Hongkong at the time the bill of lading was executed, the Pacific Mail Steamship Co. placed the cigars on board the *Yuensang* and caused them to be transported by that vessel to Hongkong, where by lighters they were immediately transferred without landing to the *Korea*. The *Korea* carried the goods to San Francisco, whence, under entry for immediate transportation in bond, they were forwarded by rail to New York. At New York the cigars were entered for immediate consumption, and the collector, after liquidating the entry as "free," delivered the goods to the importer, who sold them for $9,500. Subsequent to the sale by the importer the collector of customs, believing that the transboarding of the cigars at Hongkong interrupted their "direct shipment" from Manila to the United States and that they were therefore not entitled to free entry, ordered a reliquidation, and imposed on the merchandise duties amounting in the aggregate to some $19,000, under the provisions of paragraph 224 of the tariff act of August 5, 1909, which reads as follows:

224. Cigars, cigarettes, cheroots of all kinds, four dollars and fifty cents per pound and twenty-five per centum ad valorem, and paper cigars and cigarettes, including wrappers, shall be subject to the same duties as are herein imposed upon cigars.

The importers protested against the reliquidation and the duties imposed and claimed that the cigars were entitled to free entry under the provisions of section 5 of the act, the relevant parts of which are as follows:

SEC. 5. That there shall be levied, collected, and paid upon all articles coming into the United States from the Philippine Islands the rates of duty which are required to be levied, collected, and paid upon like articles imported from foreign countries: *Provided*, That * * * all articles the growth or product of or manufactured in the Philippine Islands from materials the growth or product of the Philippine Islands or of the United States, or of both, * * * coming into the United States from the Philippine Islands shall hereafter be admitted free of duty, except * * * cigars in excess of one hundred and fifty million cigars, which quantities shall be ascertained by the Secretary of the Treasury under such rules and regulations as he shall prescribe. * * * *And provided further*, That the free admission, herein provided, of such articles, the growth, product, or manufacture of the United States, into the Philippine Islands, or of the growth, product, or manufacture, as hereinbefore defined, of the Philippine Islands into the United States, shall be conditioned upon the direct shipment thereof from the country of origin to the country of destination: *Provided*, That direct shipment shall include shipments in bond through foreign territory contiguous to the United States.

The Board of General Appraisers sustained the protest and the Government appealed.

It seems to be conceded that the cigars were manufactured from tobacco the growth and product of the Philippine Islands within the meaning of the statute; that the limit of 150,000,000 cigars entitled to exemption from duty in any one fiscal year was not exceeded by the importation; and that shipment from origin to destination was accomplished as hereinbefore recited. There being no dispute as to the facts of the case, the question to be determined on appeal is purely one of law, namely, What construction shall be put upon the provision for "direct shipment," which is expressly made a condition for the admission free of goods coming from the Philippines to the United States?

The Government insists that no dutiable merchandise imported from the Philippines is entitled to free entry unless transported therefrom to the United States in a *single bottom* and that once such merchandise has passed beyond the maritime jurisdiction of the islands any transfer of it from one vessel to another is violative of the statutory condition and precludes its admission without payment of the usual duties. On the other hand, the importers claim that goods the product, growth, and manufacture of the Philippines are exempt from duty if their shipment is made on a through bill of lading and if as a matter of fact they come to the United States without entering into the commerce of any other country.

The language of the statutory provision is fairly susceptible of either interpretation, and it is therefore not only permissible but necessary to consider the history of the legislation and to inquire into the conditions and the circumstances inducing its enactment in order to arrive at a satisfactory conclusion touching its true purpose and intention.

The United States acquired the Philippines by cession from the Kingdom of Spain, and their acquisition was in a measure one of the unavoidable results of the Spanish-American War. The treaty between the high-contracting parties did not vest the peoples of the islands with the rights and privileges of American citizenship, and that of course left their future well-being largely dependent on whether they should be considered as utter strangers to the American household or as wards of the Nation for whose happiness and prosperity the Government was at least morally responsible. The original instructions of the President to the Philippine Commission and the organic act for the government of the islands argue strongly that the political welfare and material progress of the Filipino people were matters of real and serious concern to the American Government. Indeed, both act and instructions indicate that from the outset the United States regarded the inhabitants of its newly acquired territory as something more than mere aliens, and that in dealing with them it elected to pursue a policy which was highly altruistic and benevolent.

The establishment of civil government in the islands, the concession of a large measure of political autonomy to the peoples thereof, and the beneficent intent of legislation affecting their business interests, are all convincing evidences that a kindly purpose rather than a selfish one was to distinguish our sovereign relations with the Philippines. In this spirit was passed the act of March 8, 1902, which admitted to the United States articles the growth and product of the Philippine Islands at 75 per cent of the duty imposed on foreign imports of the same character and which directed that all the duties collected thereon be covered into the Philippine treasury. That act was intended to stimulate the business of the islands and to provide revenue for their government. Unfortunately, time and experience proved that it was not effective for either purpose, and that fact, as shown by public documents having been officially called to the attention of Congress, brought about the enactment of section 5 of the tariff act of August 5, 1909, the construction of which constitutes the present subject of dispute. That section was designed to establish a large measure of free trade between the United States and its oriental dependencies, and one of its principal objects, if not its controlling motive, was to provide a free market in the United States for all products the growth and manufacture of the Philippine Islands except rice and sugar and tobacco in excess of the maximum quantities specified.

For effective customs administration it was of course necessary to surround such a commercial concession with safeguards which would practically preclude a substitution of goods and reasonably secure the revenue of both countries against fraud or evasion. Accordingly admission free into either country of articles the growth or product or the growth, product, and manufacture of the other was conditioned upon their "direct shipment" from the country of origin to the country of destination. The term "direct shipment," considered by itself, is open, however, to several interpretations. It may mean that the goods must be carried from the Philippines to the United States or vice versa in a *single vessel* proceeding by the most direct route without stopping at way ports, or it may mean shipment *in a single vessel* following its usual and customary course, or it may mean that the goods must be originally destined for the United States or the Philippines, and that without mingling with the commerce of any other place they must come as directly from the country of origin to the country of destination as commercial limitations may permit. Which of these meanings should prevail as truly expressive of the legislative will depends on which of them best gives effect to the general policy of the Government and the main purpose of the law, and at the same time preserves the full intention of the condition. As it can not be assumed that the statute contemplated the infliction of a condition with which it was commercially impracticable to comply, the feasibility of the

condition under one meaning or another naturally becomes a subject of inquiry, and that in its turn necessarily involves a consideration of the actual commercial method of carrying goods between the United States and the Philippines which confronted the lawmakers when the tariff act of 1909 was passed.

It is a matter of history that when Spain and Portugal shared the Indies between them Manila was the dominant and most important port in the Orient. In time, however, Great Britain gained a foothold in the Far East, the Suez Canal was constructed, new avenues for commerce were opened up, and Spain lost her trade ascendancy. In consequence Hongkong became a shipping terminal and ultimately the port of final destination for nearly all deep-water craft trading with the Orient. As a result Manila ceased to be a shipping center, Philippine goods had to be carried in British bottoms, and the trade of the islands with the outside world was forced through Hongkong, to which all minor ports of adjacent territory were made tributary by the diversion to that port of shipping facilities. In the very same year in which the act was passed the evidence discloses that for the six months ending December 31 vessels of the Pacific Mail Steamship Co. and of the Toyo Kisen Kaisha made 25 trips from Hongkong to the United States, and during the same period only 7 trips from the Philippines to the same destination. In their time-tables these companies expressly direct attention to the fact that their vessels call at Manila only about once a month and that those not able to take advantage of the monthly trips should avail themselves of "*half a dozen lines of steamers*" *the vessels of which make trips between Hongkong and Manila every two or three days.* From this alone it is apparent that vessels plying between the Orient and the United States favor Hongkong as a shipping point and that only occasional trips are made to Manila. Shipping out of the Philippines by way of Hongkong was obliged by trade requirements, and of this fact Congress can not be assumed to have been ignorant, taking into account that shipping between the islands and the United States had been a subject of legislative investigation and consideration for more than seven years. (Act of March 8, 1902; act of April 15, 1904; act of April 30, 1906; act of April 29, 1908; Congressional Record of March 23, 1909.)

In the light of these facts, holding in view the settled policy governing our relations to the Philippines, considering the beneficent trend of all congressional legislation affecting them, and bearing in mind that transshipment at Hongkong of Philippine goods destined for the United States was a trade necessity, we think we would not be warranted in giving to the condition the interpretation contended for by the Government. To do so would be to hold that Congress intended to impose a condition which for lack of adequate shipping conveniences was commercially impracticable and therefore in effect frustrative of

the primary and principal purpose of the law. Our opinion in this behalf is confirmed by the attitude of the courts as to transshipment and the effect thereof on importations and their directness. For a long time judicial tribunals have appreciated that the exigencies of transportation frequently require that goods exported from other countries and destined for the United States shall be transshipped en route. In consequence the courts have held almost uniformly that such transshipment does not change the status of the goods as an importation from the country of original shipment if they have not mingled with the commerce of any other country and if the official invoices and bills of lading evidence that the United States was at the time of exportation intended to be their final destination. Millar *v.* Millar (17 Fed. Cas., 9546); Grant *v.* Peaslee (9 Fed. Cas., 1143). More than that, it has been judicially determined that notwithstanding such transshipment *the transportation of the merchandise from the port of original shipment to the United States and the voyage from the country of origin to the country of destination must be regarded as continuous.* Griswold *v.* Maxwell (11 Fed. Cas., 5838).

Again, in the case of reciprocal commercial agreements between the United States and foreign countries, it is the rule that goods are not entitled to the benefit of such agreements unless they be the products of the treaty nation and are *directly imported from it.* Nevertheless, it seems to be settled doctrine that if goods are originally shipped and destined for the United States and such fact is evidenced by consular invoices and through bills of lading a transshipment of them en route not amounting to a commingling of the goods with the commerce of the country of transshipment does not alter their status as a *direct importation* from the country of origin. The necessity for transshipment of goods, and that such transshipment should not be considered as an interruption of their direct importation, was recognized by the Treasury Department as early as May 27, 1899 (T. D. 21186), and has been scrupulously followed ever since by the Board of General Appraisers. *In re* Montagne & Son (T. D. 21565, Aug. 31, 1899); *In re* Hermann Brothers (T. D. 22447, Aug. 15, 1900); *In re* The Florida Brewing Co. (T. D. 23473–a, Jan. 21, 1902); *In re* Morello (T. D. 24971, Feb. 2, 1904); *In re* Leerburger Brothers (T. D. 25510, July 28, 1904).

If merchandise from a foreign country shown by consular invoices and through bills of lading to be destined for the United States may be transshipped without losing its character *as an importation from the country of original shipment;* if under reciprocity treaties with foreign countries goods may be admitted as *directly imported from the place of origin*, although they have been transshipped in other countries, it would seem that there could be no sound reason for refusing the same consideration to goods from an American possession invoiced

on through bills of lading for the United States and merely trans-shipped en route. To hold that Philippine products so transshipped are not directly imported from the islands, or that their transshipment, compelled by the laws of trade, constitutes a breach of the condition for their direct shipment, would be, in effect, to hold that Congress contemplated that commercial relations between the United States and its oriental possessions, for the well-being of which it stands pledged, should be hampered by conditions not exacted from foreign countries for the welfare and business prosperity of which the nation is in no way responsible. Such a holding we are not prepared to make in the absence of language which would leave us no other alternative. That the term "direct shipment" was not designed to restrict carriage to one vessel, but to insure that the goods imported into the United States should be the identical goods exported from the Philippine Islands is evidenced to some extent by the language used in the proviso relating to articles unpacked while en route by accident, wreck, or other casualty, or so damaged as to necessitate their repacking. This proviso declares that such articles—

shall be admitted free of duty upon satisfactory proof that the unpacking occurred through accident or necessity *and that the merchandise involved is the identical merchandise originally shipped from the United States or the Philippine Islands, as the case may be, and that its condition has not been changed, except for such damage as may have been sustained.*

"Direct shipment" means no more than "directly imported," and if Philippine products invoiced for the United States on a through bill of lading have been so transshipped as not to permit of their commingling en route with the commerce of any other country, the condition for direct shipment has been fulfilled according to the purpose and meaning of the statute. That the condition was based on "direct shipment" rather than on "a through bill of lading" was, in all probability, due to the fact that the former was a broad term while the latter was limited and would not cover the case of importations carried in vessels owned or chartered by the importers and which therefore had no technical bills of lading.

The fact that the law provides that "direct shipment" shall include shipments in bond through foreign territory contiguous to the United States shows no more than that the legislature was not forgetful of trade contingencies and that it was mindful of making provision for the free admission of the goods even if they should pass to the control of a carrier in contiguous territory who might not be bound by the original contract of lading.

The rule that the unnecessary transfer of a cargo insured by a particular vessel from that vessel to another avoids the policy of insurance has no application here. In such cases the insurer selects his risk by the terms of his contract of insurance and very properly

no other risk can be substituted for it without his consent unless necessity compels a substitution beneficial to him as well as to the insured.

The decision of the Board of General Appraisers is *affirmed.*

MONTGOMERY, Presiding Judge, and HUNT, BARBER, and DE VRIES, Judges, concur.