AGENCY CANADIAN CAR & FOUNDRY Co. *v.* UNITED STATES (No. 2036).[1]

1. CONSTRUCTION, PARAGRAPH M, SECTION IV, TARIFF ACT OF 1913 AND ARTICLES 709, 710, 747, 748, AND 749, CUSTOMS REGULATIONS 1915.

An oral application to the deputy collector of customs in charge of bonded manufacturing warehouses for the establishment of such a warehouse is not a compliance with paragraph M, section IV, tariff act of 1913, prescribing the mode of establishing such warehouses and articles 709, 710, 747, 748, and 749, Customs Regulations 1915, promulgated pursuant thereto. Under such circumstances it can not be said that *any* application was made.

2. IMPORTATION.

Merchandise, entered for consumption and brought into this country for the purpose of being manufactured here and exported, is imported and subject to duty.

3. IMPORTATIONS TO BE EXPORTED DESTROYED BY FIRE.

Appellant was accustomed to import merchandise, pay the duties, manufacture it, and export it, taking the drawback. Some of such merchandise was destroyed by fire. He can not escape the payment of duties on it, notwithstanding that the deputy collector may have arbitrarily denied his oral application for the establishment of a bonded manufacturing warehouse and notwithstanding that he may have intended that it should not enter into the commerce of this country.

United States Court of Customs Appeals, November 23, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8330 (T. D. 38354.)

[Affirmed.]

*Allan R. Brown (Gerry & Wakefield* of counsel) for appellant.
*Bert Hanson,* Assistant Attorney General (*Martin T. Baldwin,* special attorney, of counsel), for the United States.

[Oral argument Oct. 26, 1920, by Mr. Brown and Mr. Gerry and Mr. Baldwin.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Under date of February 14 and of February 23, 1915, the Canadian Car & Foundry Co. (Ltd.), of Canada, contracted to manufacture for the Russian Government 2,500,000 so-called 3-inch shrapnel shells and 2,500,000 so-called 3-inch high-explosive shells. The contracts provided that every shell, whether shrapnel or explosive, should, when completed, consist of a brass cartridge case, a loaded primer, and a propellant charge of pyroxylin powder—the finished explosive projectiles to be loaded with trinitrotoluol and the shrapnel projectiles with powder, bullets and a mixture of resin. Each shrapnel projectile was required to be fitted with a double section aluminum fuse, and each explosive projectile with a fully loaded safety detonator screwed into the projectile.

[1] T. D. 38547 (39 Treas. Dec., 738).

The Agency of the Canadian Car & Foundry Co. (Ltd.), a corporation organized under the laws of the State of New York, was authorized by the Canadian Car & Foundry Co. (Ltd.), of Canada, to carry out the contracts with the Russian Government, and for that purpose a munition plant was established at Kingsland, N. J.

Large quantities of shrapnel projectiles, explosive projectiles and brass cases were sent by the Canadian company to the agency and were entered at Rouse Point, N. Y., for immediate transportation to the plant at Kingsland. The cases and projectiles were entered at the subport of Newark, N. J., for consumption, and the duties having been paid thereon, they were turned over to the agency at Kingsland. At Kingsland the explosive projectiles were loaded with T. N. T. and the shrapnel projectiles with bullets and the bursting charge. Both kinds of projectiles were then fitted into the brass cases containing the pyroxylin powder.

On January 11, 1917, while the agency was engaged in carrying out the contract of the Canadian Car & Foundry Co. (Ltd.), the plant and material of the agency at Kingsland were in large part destroyed by a disastrous explosion and fire.

The number of shrapnel projectiles brought into the country was 221,906, of which number 210,844 were exported, leaving on hand at the time of the explosion and fire 11,062, on which a duty of $8,296.45 had been assessed and collected. The number of brass cases sent from Canada to Kingsland was 305,229, of which 284,892 had been exported at the time of the explosion and fire, leaving on hand 20,337 on which a duty of $7,321.32 had been assessed and collected. Explosive projectiles amounting to 427,677 were shipped from Canada to Kingsland, of which 146,499 were exported, leaving on hand at the time of the destruction of the plant 281,178 on which a duty of $192,457.30 had been assessed and collected.

The customs broker of the agency testifies that in October, 1915, he interviewed the deputy collector of customs in charge of bonded manufacturing warehouses and made an oral application for the establishment of the Kingsland plant as a bonded warehouse, which application, according to the customs broker, was denied on the ground that the United States was trying to preserve its absolute neutrality during the war and that the bonding of a plant engaged in the making of munitions for one of the belligerents would constitute a breach of that neutrality. As a result of the interview the materials for munitions shipped from Canada to Kingsland were all entered for consumption and the duties paid thereon, against which duties no protest was made until after the plant was de-

stroyed. On such of the materials of Canadian origin as were made up into shells and exported drawback was claimed by the agency and allowed by the Government.

The agency protested against such duties only as were liquidated by the collector after the explosion and fire or within 30 days prior thereto, and based its protest upon the ground, among other things, that the goods did not enter into the commerce of the United States and were not imported into the country within the meaning of the tariff law. The Board of General Appraisers overruled the protest and the agency appeals to this court for relief.

Counsel for the appellant contends in effect, first, that the agency having applied to the deputy collector of customs of New York in charge of bonded warehouses for the establishment of the plant at Kingsland as a bonded manufacturing warehouse, and that that application, having been wrongfully and arbitrarily denied, payment of duties was made under duress and, the agency having done all on its part which the law required of it, the bonded warehouse must be regarded as established; second, that it was never intended either by the shipper or consignee that the goods should mingle with the commerce of the country or become a part of the mass of things belonging thereto, and that therefore they were neither imported nor subject to duty.

We can not agree with either contention. Paragraph M, section IV, of the tariff act of 1913 provides:

That all articles manufactured in whole or in part of imported materials * * * and intended for exportation without being charged with duty, * * * shall, under such regulations as the Secretary of the Treasury may prescribe, in order to be so manufactured and exported, be made and manufactured in bonded warehouses similar to those known and designated in Treasury Regulations as bonded warehouses, class six: *Provided,* That the manufacturer of such articles shall first give satisfactory bonds for the faithful observance of all the provisions of law and of such regulations as shall be prescribed by the Secretary of the Treasury: * * *

Whenever goods manufactured in any bonded warehouse established under the provisions of the preceding paragraph shall be exported directly therefrom or shall be duly laden for transportation and immediate exportation under the supervision of the proper officer who shall be duly designated for that purpose, such goods shall be exempt from duty. * * *.

The regulations prescribed by the Secretary of the Treasury provide that:

The general provisions pertaining to warehouses for the storage of bonded merchandise shall, so far as relevant, apply to bonded manufacturing warehouses. (Art. 747, Customs Regulations, 1915.)

The regulation for the establishment of a bonded storage warehouse requires that the application shall be made to the *collector in writing.*

Such application must be accompanied by a certificate, signed by the president or secretary of a board of fire underwriters, * * * or by the officers or agents of two or more insurance companies, stating that the building is a suitable warehouse, acceptable for fire insurance purposes. (Art. 710, Customs Regulations, 1915.)

It is further prescribed by the regulations that the application for the establishment of a bonded manufacturing warehouse—

Shall be made to the collector of customs at the port where situated, describing the size, construction, and location of the premises, and setting forth the manufacture proposed to be carried on in the same, stating the kinds of materials intended to be stored and used therein. (Art. 748, Customs Regulations, 1915.)

The bond required by the regulations for a manufacturing warehouse is the same as that required for importers' private bonded storage warehouses, with the exception that the bond must be executed in triplicate in such penalty as the collector shall deem proper and subject to the approval of the Secretary of the Treasury. (Art. 749 and Art. 709, Customs Regulations, 1915.)

Neither the deputy collector nor the collector of customs has any power whatever to grant an application for the establishment of a bonded warehouse, and any attempt on the part of either to do so would be in clean-cut violation of the customs regulations and a usurpation of the functions of the Secretary of the Treasury. Once an application for a bonded warehouse is filed with the collector and he has examined or caused to be examined the premises described therein, the application, the prescribed insurance certificates together with the collector's report and recommendation, must be forwarded to the department for action, and there the customhouse control of the application ends. As no application was ever filed with the collector and as none of the things were done which the reasonable regulations of the Secretary of the Treasury require, it can not be said that the agency made application for the establishment of a bonded manufacturing warehouse, much less that such application was arbitrarily denied by proper authority.

It would be going far indeed to say that the wholly unauthoritative declaration of the deputy collector excused the filing of the application which the regulations expressly prescribed and that such a declaration must be regarded as a denial by the Secretary of the Treasury of an application which was in fact never made. We must hold, therefore, that there was no offer or attempt to comply with any of the regulations for the establishment of a manufacturing bonded warehouse and that consequently the plant at Kingsland can not be treated as a bonded manufacturing warehouse.

The claim that the materials for munitions were not imported, inasmuch as they were not unladen at destination with the intent

that they should mingle with the mass of things belonging to the United States and become a part of the commerce of the country, can not be sustained. To hold otherwise would make the mental attitude of the owner, shipper, or consignee, instead of what was done, the controlling factor in determining whether merchandise was or was not imported. More than that, it would wholly ignore the fact that such munitions came within the customs jurisdiction and were designedly unladen for manufacturing purposes in the United States in just the same way as other merchandise arriving from abroad and intended for manufacture and exportation. Indeed, if we hold that the materials in this case were not imported *because there was no intention to mingle them with the trade and commerce of the country inasmuch as it was the purpose to export them after being made up into articles ready for use,* then all other merchandise coming into the country from abroad and intended for exportation after manufacture must likewise he held not to be imported, and any such ruling as that would in effect render inoperative not only the tariff provisions for drawback but also those for bonded manufacturing warehouses.

The record in the case makes it clear that the original purpose to establish a bonded manufacturing warehouse and so escape the payment of duties necessitated by an entry of the goods for consumption was abandoned by the agency long prior to the bringing into the country of any of the goods. Not only was all idea of a bonded manufacturing warehouse abandoned, but the evidence in the case establishes beyond question that the agency concluded to *import* the materials, pay the duties thereon, and avail itself of the drawback provision to recover 99 per cent of the duties so paid. Drawback can be claimed only on imported merchandise and the claim and allowance thereof necessarily implied an importation. (Sec. IV, par. O, tariff act, 1913.) The fact that the destruction of the agency's plant precluded the manufacture and exportation of the completed shells and thereby deprived the manufacturer of the right to drawback, did not change the status of the materials as imported goods subject to duty.

The appellant has been the victim of a great misfortune and the appeal is strong that it should not suffer the loss of its goods and the very large amount of duties paid thereon as well. Nevertheless, as the law has made no provision for the return of duties in such cases as this, the court is powerless to grant relief.

The decision of the Board of General Appraisers must be *affirmed.*