EAST ASIATIC CO., INC. *v.* UNITED STATES (No. 4272)[1]

---

United States Court of Customs and Patent Appeals, March 20, 1940

*Lawrence & Tuttle* (*Charles F. Lawrence* of counsel) for appellant.
*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney, of counsel), for the United States.

[Oral argument December 11, 1939, by Mr. Spector and Mr. Tuttle]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellant has appealed from the judgment of the United States Customs Court, Third Division, which overruled its protest against the action of the collector at the port of Los Angeles in levying a 10 per centum ad valorem additional duty on a cargo of copra meal shipped from Mexico.

The 10 per centum additional duty was levied under the provisions of section 304 (b) of the Tariff Act of 1930, reading as follows:

SEC. 304 (b). ADDITIONAL DUTIES FOR FAILURE TO MARK.—If at the time of importation any article or its container is not marked, stamped, branded, or labeled in accordance with the requirements of this section, there shall be levied, collected, and paid on such article, unless exported under customs supervision, a duty of 10 per centum of the value of such article, in addition to any other duty imposed by law, or, if such article is free of duty, there shall be levied, collected, and paid a duty of 10 per centum of the value thereof.

The facts relating to bringing the involved goods into this country and the circumstances surrounding the levying of the additional duty in controversy are well stated in appellant's brief and such statement, omitting certain numerals relating to record pages and exhibits, follows:

On October 21, 1936, appellant brought into Los Angeles harbor 6822 bags of copra meal, which, according to the ship's manifest "was taken on board at Mazatlan, Mexico, for transshipment to Copenhagen, per MS India." The merchandise was intended to be transferred at Los Angeles under customs custody and supervision from MS Panama to MS India, of the same steamship line, and in furtherance of this design it was entered at Los Angeles upon export entry, 427, in accordance with article 912, Customs Regulations of 1931, and was deposited upon the wharf under customs bond and in customs custody, to await arrival of MS India and consequent removal thereon.

At the end of October, 1936, a general strike of stevedores and longshoremen at all Pacific ports became effective and remained so for over three months, so that when the MS India arrived it had become impossible to load the merchandise upon it. Consequently the merchandise remained on the wharf for over a month, the intention to forward it to Copenhagen was abandoned, and it was decided to sell it in the United States. Thereupon appellant caused the bags containing the merchandise to be marked with the name of the country of origin, and on December 12, 1936, entered it for consumption on entry 4784.

On the theory that the merchandise was unmarked at time of importation the

collector assessed in addition to regular duties, the 10 percent penalty provided by section 304 (b), tariff act of 1930 * * *.

The question presented is what construction and application is to be given to the above quoted section 304 (b) and more particularly what meaning is to be given to the term "importation" contained therein.

Appellant contends that the goods were marked at the time of "importation" and cites the most frequently given definition of that term which is that importation consists of bringing goods within the jurisdictional limits of the United States with the intention to unlade them, citing *United States* v. *Field & Co.*, 14 Ct. Cust. Appls. 406, T. D. 42052; *United States* v. *Estate of Boshell*, 14 Ct. Cust. Appls. 273, T. D. 41884; and *May Co.* v. *United States*, 12 Ct. Cust. Appls. 266, T. D. 40270. It contends, however, that every "bringing-in" of goods does not constitute an importation, and that in the instant case there was no intention to import; that when the goods were brought into our customs jurisdiction it was the intention of the appellant that the goods should go into the commerce of Denmark rather than the United States. Appellant, therefore, argues in effect that the intent of the appellant is determinative of the question at bar. Appellant's counsel cites and relies largely upon the case of *United States* v. *United Cigar Stores Co.*, 1 Ct. Cust. Appls. 450, T. D. 31505, which involved cigars shipped from the Philippines to the United States by way of Hongkong in which city they were transshipped. This court held that the shipment was a direct one from the Philippines and that Hongkong was not the country of origin, but that the Philippines was. Numerous other cases are cited which decided almost the identical issue in substantially the same way and call for no detailed discussion here.

It is well settled that the meanings to be given to the terms "importation" and "import" when used by Congress often differ, the variation depending upon the context of the provision in which the terms are used and the object to be attained by their use. In a number of cases the courts have held that Congress used the terms "import" and "importation" in a sense differing from the meaning which is most frequently ascribed to them. See *Cunard Steamship Co., Ltd., et al.* v. *Mellon, Secretary of the Treasury, et al.* [etc.], 262 U. S. 100, and *Procter & Gamble Manufacturing Co.* v. *United States*, 19 C. C. P. A. (Customs) 415, T. D. 45578.

Usually, of course, although there are exceptions to the rule, "import" in a tariff sense implies the bringing into this country of foreign goods for use or consumption here, and it seems to us that when Congress enacted section 304 (b), *supra*, relating to the marking of any imported goods, it had in mind merchandise which was to enter into our commerce. Unless the goods entered into our com-

merce, a failure to mark them would be of no concern and we know of no holding by this or any other court (certainly none has been cited here) where under circumstances like those at bar the importer of the goods intentionally entered them to go into the commerce of the country and was excused from paying the additional duty imposed for failure to mark merely because it had been the original intention of the importer not to so enter them. The ship carrying the goods crossed the customs border with the unmarked goods. Surely, under any definition of the term "import" they were completely imported as far as intent was concerned when the importer changed its mind and decided that they should go into the commerce of this country. They were not marked at that time and we are of the opinion that a subsequent marking under the circumstances stated would not warrant the collector in failing to levy the 10 per centum duty in question. The intent to cross the customs border, no matter for what purpose, merges into the act of importation when the goods are actually entered for consumption.

The decision of the trial court appears to be based mainly upon the proposition that the definition of the term "import," laid down in *United States* v. *Estate of Boshell, supra,* was controlling and applied to the facts at bar. The definition there stated was "Imported merchandise is merchandise that has been brought within the limits of a port of entry from a foreign country with intention to unlade." The trial court in the instant case then said:

It is manifest that under the rule announced in those decisions [*United States* v. *Estate of Boshell, supra; United States* v. *Field & Co., supra;* and *Loblaw Groceterias, Inc.* v. *United States,* 22 C. C. P. A. (Customs) 479, .T. D. 47481], the "time of importation" of the copra meal therein involved was the time the vessel containing the merchandise crossed the customs border because at that time *the importers intended to unlade the goods on the dock at Los Angeles.* [Italics ours]

We are not in agreement with the finding of the court that when the goods were unloaded on the dock at Los Angeles, under the circumstances at bar, it was the character of unlading referred to in the *Boshell* case, *supra.* The goods were unloaded for the purpose of being reshipped under a definite regulation of the Secretary of the Treasury authorized by the statute, which regulation obviously applied to goods which were not to be unloaded for the purpose of entering the commerce of the country. It would seem to us that if the goods had not been unloaded from a ship until it had been decided to enter the same in the United States for consumption, the situation as far as the results are concerned would not be changed.

In order to further the purposes of the marking provisions, the courts have very strictly construed the statute with respect to situations quite analogous to that at bar. At times such a strict compliance with the statute has been required that apparent inequities resulted.

In the instant case appellant complains of the fact that although it did not intend that the goods come into this country at the time when the marking might have taken place, it is now penalized by the fact that it was required to enter them for consumption or suffer great loss. While these circumstances appeal to us from an equitable standpoint, it is clear nevertheless that appellant was not required to enter the goods for consumption or for that matter to enter our ports in the first place and, if it finds itself in difficulties, this court, in the absence of legislation designed to remedy such a condition, can do nothing else than approve the action of the trial court in its ruling sustaining the action of the collector in his strict application of the law in question.

While there is no case exactly in point we think the decisions in a number of cases suggest the correctness of the conclusion which we herein reach.

In *Agency Canadian Car & Foundry Co.* v. *United States*, 10 Ct. Cust. Appls. 172, T. D. 38547, materials for munitions were shipped from Canada during the World War and were here entered for consumption and duties paid thereon. The material was to go into munitions which were to be shipped back to Canada. The material was destroyed when the factory was destroyed by explosion and fire. Protest was filed against the liquidation and assessment of duties on the goods for the alleged reason that they did not enter into the commerce of the United States and were not imported into the country within the meaning of the tariff law. This court, in affirming the judgment of the Board of General Appraisers (now the United States Customs Court) in overruling the protest, stated:

The claim that the materials for munitions were not imported, inasmuch as they were not unladen at destination with the intent that they should mingle with the mass of things belonging to the United States and become a part of the commerce of the country, can not be sustained. *To hold otherwise would make the mental attitude of the owner, shipper, or consignee, instead of what was done, the controlling factor in determining whether merchandise was or was not imported.* More than that, it would wholly ignore the fact that such munitions came within the customs jurisdiction and were designedly unladen for manufacturing purposes in the United States in just the same way as other merchandise arriving from abroad and intended for manufacture and exportation. Indeed, if we hold that the materials in this case were not imported *because there was no intention to mingle them with the trade and commerce of the country inasmuch as it was the purpose to export them after being made up into articles ready for use,* then all other merchandise coming into the country from abroad and intended for exportation after manufacture must likewise be held not to be imported, and any such ruling as that would in effect render inoperative not only the tariff provisions for drawback but also those for bonded manufacturing warehouses. [First italics new here.]

We think that much that was said there applies here. Appellant in effect seeks to have the mental attitude of the owner of the goods rather than what was done the controlling factor in determining when the merchandise was imported.

In *Kee Co. et al.* v. *United States*, 13 Ct. Cust. Appls. 105, T. D. 40943, the goods were shipped from a foreign country before the Tariff Act of 1922 requiring marking went into effect. They did not arrive in this country until after the act became operative. The goods were not marked. The collector assessed them with 10 per centum duty under the marking provision of that act. Importer's protest was overruled by the Board of General Appraisers and this court affirmed its judgment.

While the facts in that case differ from those in the case at bar, it is thought that the decision is pertinent to the instant issue in that it was there held that the additional duties were properly assessed regardless of the fact that at the time when the goods could have been marked there was no law requiring it.

Another case which we think has some analogy to the one at bar is the recent decision of this court in *Silberman-Becker Corp.* v. *United States*, 27 C. C. P. A. (Customs) 79, C. A. D. 65, in which two bales of fur skins said to have been destined for London, England, were shipped from Canada in bond to New York where they were entered in bonded warehouse under the provisions of the Tariff Act of 1930. The merchandise was ordered to the appraiser's stores and there examined. Three days after the warehouse entry an export entry was made and the bales were shipped from the appraiser's stores in customs custody under cord and seal and under customshouse license, delivered to a pier where they were received by the appropriate customs officials, and placed in the custody of customs guards. While in such custody one of the bales was stolen. It was the intention of the parties to export the goods but this court strictly construed section 357, the warehouse provision, "or may be withdrawn for exportation or for transportation and exportation to a foreign country, * * * without the payment of duties thereon * * *," and held that something more than intent was required and that for the importer to be entitled to relief it was necessary to show that the goods had actually been exported.

In addition to what has already been said, we think that one of the judges of the trial court, in a concurring opinion, pointed out a very material consideration in the decision of the instant case to the effect that Congress would seem to have specified the terms under which a failure to mark would not justify the imposition of the 10 per centum additional duty by providing that the same would apply unless the goods were "exported under customs supervision." The goods in the instant case were not exported and in applying the law, this court, not being a court of equity, cannot disregard this fact merely because of the longshoremen's strike and the original intent of the importer.

We think the collector properly levied the additional duty and that the trial court did not commit error in overruling appellant's protest. The judgment appealed from is *affirmed*.

370

LENROOT, Judge: I respectfully dissent from the conclusion reached by the majority in this case. It seems very clear to me that when the merchandise was unloaded on the dock at Los Angeles for transshipment to Denmark, and the proper entries were made for such transshipment, together with a bond as the law and regulations require in such cases, it was not subject to the provisions of section 304 (b).

We have many times held that the purpose of the marking statute was to protect the United States manufacturer and purchaser of the merchandise. Obviously there could be no object in marking merchandise that was never intended to be imported and enter into the commerce of the United States.

It is my opinion that the instant merchandise was not, before being marked, "imported" within the meaning of that word as used in section 304 (a); or, in other words, when landed on the dock at Los Angeles it was not imported merchandise. The general rule is that merchandise is imported when it is brought within a port of entry with intent to unlade. *Minneapolis Cold Storage Co.* v. *United States,* 9 Ct. Cust. Appls. 225, T. D. 38200.

The trial court held that the mere unloading of the merchandise on the dock at Los Angeles brought it within that rule. However, the majority opinion here, I think very properly, disagrees with this view and in effect, it seems to me, holds that the merchandise was not originally brought into this country with intent to unlade.

There are many decisions which, in principle, hold that merchandise brought into this country under facts somewhat similar to those at bar is not imported at the time it enters the territorial limits of the United States. Among them are *McLean* v. *Hager,* 31 Fed. 602; *United States* v. *Cronkhite Co.,* 9 Ct. Cust. Appls. 129, T. D. 37980; *Five Per Cent Cases,* 6 Ct. Cust. Appls. 291, T. D. 35508.

The case of *Kee Co. et al.* v. *United States,* 13 Ct. Cust. Appls. 105, T. D. 40943, is cited and discussed in the majority opinion. The distinction between that case and the case at bar is obvious when we observe that in the cited case the merchandise was brought into the United States with intent to unlade; while, as hereinbefore stated, the majority opinion in the case at bar holds that when the involved merchandise was brought into the United States and landed on the dock at Los Angeles there was no intention to unlade.

The other cases discussed in the majority opinion obviously, it seems to me, have no application to the case at bar.

The majority opinion contains the following statement:

* * * The ship carrying the goods crossed the customs border with the unmarked goods. Surely, under any definition of the term "import" they were completely imported as far as intent was concerned *when the importer changed*

*its mind and decided that they should go into the commerce of this country.* They were not marked at that time and we are of the opinion that a subsequent marking under the circumstances stated will not warrant the collector in failing to levy the 10 per centum duty in question. The intent to cross the customs border, no matter for what purpose, merges into the act of importation when the goods are actually entered for consumption. [Italics mine.]

I infer from the foregoing that it is the view of the majority that if the importer had marked the goods one hour before deciding to import them into the commerce of this country the majority would have reached a different conclusion; but, because the marking immediately followed this decision, no relief may be granted to appellant. It seems to me that this is an extremely technical view of the case and one that does not comport with reason. If there was no duty to mark until appellant decided that the goods should enter the commerce of the country, and as the majority opinion impliedly holds, then appellant was in no wise in default in failing to mark the goods up to that time.

In the case of *Asiam, Inc.* v. *United States*, 25 C. C. P. A. (Customs) 68, T. D. 49065, speaking of the marking statute here involved, we said:

* * * As, of course, the statute does not require the impossible, nor does it, in our opinion, require anything except that which is reasonable. * * *

So here, in a case like that at bar, I think it should be held that if the goods are promptly marked after their importation into the commerce of the country has been decided upon, and before the goods have been released from customs custody, that is sufficient. To require more we would be compelled to hold that the statute required more than "that which is reasonable."

The majority opinion states that appellant seeks to have the mental attitude of the owner, rather than what was done, the controlling factor in determining when the merchandise was imported. I cannot agree with this statement. Appellant is relying upon what was in fact done as evidence of his intention; and so far as intention is concerned, I would repeat that this court has many times stated that merchandise is imported when it is brought into this country with *intent* to unlade. So *intention* is a material factor in determining when merchandise is imported. In fact the majority opinion recognizes this when it holds that there was no intent to unlade when the merchandise was originally brought into this country.

The concurring opinion in the trial court stresses the provision of section 304 (b) that if, at the time of importation, merchandise is not marked, it shall pay the 10 per centum duty *"unless exported under customs supervision."* (Italics mine.) Obviously this provision applies only to the imported merchandise referred to in section 304 (a), and cannot refer to merchandise not imported in a tariff

sense, although within the territorial limits of this country. In this connection I would observe that the majority opinion of the trial court appears to distinguish between the terms "imported" and "importation." The latter is the term used in section 304 (b), but the term "imported" is used in section 304 (a) which requires merchandise to be marked. Surely it could not be successfully argued that merchandise not required to be marked under section 304 (a) is required to be marked under section 304 (b).

In the case at bar the merchandise was voluntarily marked by appellant immediately upon its decision to enter the goods for con sumption in this country. There is not the slightest indication of bad faith upon the part of appellant. The majority admits the inequitable nature of its conclusion, but holds that under the law no relief may be given appellant. In my opinion it is only a strained construction which prevents such relief; and, believing as I do that laws should be construed whenever possible to promote justice and equity, I think the judgment appealed from should be reversed.

I am authorized to say that Presiding Judge Garrett concurs in this dissent.